# SURE-TAN, INC., ET AL. *v.* NATIONAL LABOR RELATIONS BOARD

No. 82–945.   Argued December 6, 1983—Decided June 25, 1984

884

*Michael R. Flaherty* argued the cause for petitioners. With him on the briefs were *John A. McDonald* and *Robert A. Creamer.*

*Edwin S. Kneedler* argued the cause for respondent. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Wallace, Norton J. Come,* and *Linda Sher.*\*

---

\*Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *J. Albert Woll, Laurence Gold,* and *George Kaufmann;* for the Asian American Legal Defense and Education Fund et al. by *Kenneth Kimerling;* for the

JUSTICE O'CONNOR delivered the opinion of the Court.

At issue in this case are several questions arising from the application of the National Labor Relations Act (NLRA or Act) to an employer's treatment of its undocumented alien employees. We first determine whether the National Labor Relations Board (NLRB or Board) may properly find that an employer engages in an unfair labor practice by reporting to the Immigration and Naturalization Service (INS) certain employees known to be undocumented aliens in retaliation for their engaging in union activity, thereby causing their immediate departure from the United States. We then address the validity of the Board's remedial order as modified by the Court of Appeals.

I

Petitioners are two small leather processing firms located in Chicago that, for purposes of the Act, constitute a single integrated employer. In July 1976, a union organization drive was begun. Eight employees signed cards authorizing the Chicago Leather Workers Union, Local 431, Amalgamated Meatcutters and Butcher Workmen of North America (Union), to act as their collective-bargaining representative. Of the 11 employees then employed by petitioners, most were Mexican nationals present illegally in the United States without visas or immigration papers authorizing them to work. The Union ultimately prevailed in a Board election conducted on December 10, 1976.

Two hours after the election, petitioners' president, John Surak, addressed a group of employees, including some of the undocumented aliens involved in this case. He asked the

California Agricultural Labor Relations Board by *Manuel M. Medeiros, Nancy C. Smith,* and *Daniel G. Stone;* for the California Rural Legal Assistance Foundation by *Mary K. Gillespie;* for the Mexican American Legal Defense and Education Fund et al. by *Peter R. Taft, Allen M. Katz, Joaquin G. Avila, John E. Huerta,* and *Morris J. Baller;* and for the United Farm Workers of America, AFL–CIO, by *Carlos M. Alcala* and *Ira L. Gottlieb.*

employees why they had voted for the Union and cursed them for doing so. He then inquired as to whether they had valid immigration papers. Many of the employees indicated that they did not.

Petitioners filed with the Board objections to the election, arguing that six of the seven eligible voters were illegal aliens. Surak executed an accompanying affidavit which stated that he had known about the employees' illegal presence in this country for several months prior to the election. On January 19, 1977, the Board's Acting Regional Director notified petitioners that their objections were overruled and that the Union would be certified as the employees' collective-bargaining representative. The next day, Surak sent a letter to the INS asking that the agency check into the status of a number of petitioners' employees as soon as possible. In response to the letter, INS agents visited petitioners' premises on February 18, 1977, to investigate the immigration status of all Spanish-speaking employees. The INS agents discovered that five employees were living and working illegally in the United States and arrested them. Later that day, each employee executed an INS form, acknowledging illegal presence in the country and accepting INS's grant of voluntary departure as a substitute for deportation. By the end of the day, all five employees were on a bus ultimately bound for Mexico.

On February 22 and March 23, 1977, the Board's Acting Regional Director issued complaints alleging that petitioners had committed various unfair labor practices. On March 29, 1977, petitioners sent letters to the five employees who had returned to Mexico offering to reinstate them, provided that doing so would not subject Sure-Tan to any violations of United States immigration laws. The offers were to remain open until May 1, 1977.

The unfair labor practice charges were heard by an Administrative Law Judge (ALJ), whose findings and conclusions as to the merits of the complaints were affirmed and adopted by

the Board. Specifically, the Board affirmed the ALJ's conclusion that petitioners had violated §§ 8(a)(1) and (3)[1] by requesting the INS to investigate the status of their Mexican employees "solely because the employees supported the Union" and "with full knowledge that the employees in question had no papers or work permits." *Sure-Tan, Inc.*, 234 N. L. R. B. 1187 (1978). The Board, therefore, agreed with the ALJ's finding that "the discriminatees' subsequent deportation was the proximate result of the discriminatorily motivated action by [petitioners] and constitutes a constructive discharge." *Id.*, at 1191.[2]

As a remedy for the § 8(a)(3) violations, the Board adopted the ALJ's recommendation that petitioners be ordered to cease and desist from their various unfair labor practices, including notifying the INS of their employees' status because of the employees' support of the Union. However, the Board declined to adopt the ALJ's specific recommendations as to the appropriate remedy. The ALJ had recommended that petitioners be ordered to offer the discharged employees reinstatement and that the offers be held open for six months. In addition, the ALJ had concluded that since, under past Board precedent, backpay is normally tolled dur-

---

[1] Sections 8(a)(1) and (3) of the Act, 61 Stat. 140, as amended, 29 U. S. C. §§ 158(a)(1) and (3), make it an "unfair labor practice" for an employer "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title" or "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." Section 7 grants employees the rights of self-organization, participation in labor organizations and concerted activity, and collective bargaining. See 29 U. S. C. § 157.

[2] The Board also affirmed the findings of the ALJ that petitioners had violated § 8(a)(1) of the Act by (1) threatening employees with less work if they supported the Union and promising more work if they did not; (2) interrogating employees about their Union sentiments; (3) threatening the employees immediately after the election to notify the INS because they had supported the Union; and (4) threatening to go out of business because the Union won the election.

ing those periods in which employees are not available for employment, an ordinary backpay award could not be ordered in this case. Nevertheless, the ALJ had invited the Board to consider awarding backpay for a minimum 4-week period both to provide some measure of relief to the illegally discharged employees and to deter future violations of the NLRA.

The Board, however, concluded that the ALJ's analysis of the remedy was "unnecessarily speculative." 234 N. L. R. B., at 1187. Since the record contained no evidence that the employees had not since returned to the United States, the Board modified the ALJ's order by substituting the "conventional remedy of reinstatement with backpay," thereby leaving until subsequent compliance proceedings the determination whether the employees had in fact been available for work.[3] *Ibid.*

On appeal, the Court of Appeals enforced the Board's order. 672 F. 2d 592 (CA7 1982). The court fully agreed that petitioners had violated the NLRA by constructively discharging their undocumented alien employees. It also concurred in the Board's judgment that the usual remedies of reinstatement and backpay were appropriate in these circumstances. The Court of Appeals did, however, modify the Board's order in several significant respects. First, it concluded that reinstatement would be proper only if the discharged employees were legally present and free to be employed in the United States when they presented themselves for reinstatement. The court also decided that the reinstatement offers in their present form were deficient since they

---

[3] The Board's General Counsel then filed a motion for clarification in which he suggested that the Board's remedial order might violate national immigration laws by requiring reinstatement and backpay without explicit regard to the legality of the employees' immigration status. The Board denied the General Counsel's motion, over the dissents of two members, who argued that the order's failure to condition the offers of reinstatement on legal presence within this country would encourage illegal reentry by the employees. See *Sure-Tan, Inc.,* 246 N. L. R. B. 788 (1979).

did not allow a reasonable time for the employees to make arrangements for legal reentry. The court therefore ordered that the offers be left open for a period of four years. It further concluded that the offers must be written in Spanish, and delivered so as to allow for verification of receipt.

As for backpay, the court required that the discharged employees should be deemed unavailable for work during any period when they were not legally entitled to be present and employed in the United States. Recognizing that the discharged employees would most likely not have been lawfully available for employment and so would receive no backpay award at all, the court decided that "it would better effectuate the policies of the Act to set a minimum amount of backpay which the employer must pay in any event, because it was his discriminatory act which caused these employees to lose their jobs." *Id.*, at 606. Believing that six months' backpay would be the minimum amount appropriate for this purpose, the court suggested that the Board consider this remedy. The Board accepted the court's suggestion, and the final judgment order approved by the court included the minimum award of six months' backpay.[4] We granted certiorari, 460 U. S. 1021 (1983). We now affirm the judgment of the Court of Appeals insofar as it determined that petitioners violated the Act by constructively discharging their undocumented alien employees, but reverse the judgment as to some of the remedies ordered and direct that the case be remanded to the Board.

---

[4] The Board did not issue a new decision regarding the 6-month minimum backpay award, but merely submitted a proposed judgment order that was evidently intended to incorporate the proposed award. Upon reviewing the Board's proposed order, the court still remained uncertain whether the Board had in fact adopted its suggestion, and so modified the order to make clear that the employees were entitled to a minimum award of six months' backpay. App. to Pet. for Cert. 28a. A petition for rehearing with suggestion for rehearing en banc was denied, with three judges dissenting. 677 F. 2d 584 (1982).

## II

### A

We first consider the predicate question whether the NLRA should apply to unfair labor practices committed against undocumented aliens. The Board has consistently held that undocumented aliens are "employees" within the meaning of § 2(3) of the Act.[5] That provision broadly provides that "[t]he term 'employee' shall include any employee," 29 U. S. C. § 152(3), subject only to certain specifically enumerated exceptions. *Ibid.* Since the task of defining the term "employee" is one that "has been assigned primarily to the agency created by Congress to administer the Act," *NLRB* v. *Hearst Publications, Inc.*, 322 U. S. 111, 130 (1944), the Board's construction of that term is entitled to considerable deference, and we will uphold any interpretation that is reasonably defensible. See, *e. g., Ford Motor Co.* v. *NLRB*, 441 U. S. 488, 496–497 (1979); *NLRB* v. *Iron Workers*, 434 U. S. 335, 350 (1978); *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 236 (1963).

The terms and policies of the Act fully support the Board's interpretation in this case. The breadth of § 2(3)'s definition is striking: the Act squarely applies to "any employee." The only limitations are specific exemptions for agricultural laborers, domestic workers, individuals employed by their spouses or parents, individuals employed as independent contractors or supervisors, and individuals employed by a person who is not an employer under the NLRA. See 29 U. S. C. § 152(3).

---

[5] In extending the coverage of the Act to undocumented aliens, the Board has included such workers in bargaining units, see *Duke City Lumber Co.*, 251 N. L. R. B. 53 (1980); *Sure-Tan, Inc., and Surak Leather Co.*, 231 N. L. R. B. 138 (1977), enf'd, 583 F. 2d 355 (CA7 1978), and has found violations of the Act both in their discriminatory discharge, see *Apollo Tire Co.*, 236 N. L. R. B. 1627 (1978), enf'd, 604 F. 2d 1180 (CA9 1979); *Amay's Bakery & Noodle Co.*, 227 N. L. R. B. 214 (1976), and in threats of deportation intended to deter their union activities, see *Hasa Chemical, Inc.*, 235 N. L. R. B. 903 (1978).

Since undocumented aliens are not among the few groups of workers expressly exempted by Congress, they plainly come within the broad statutory definition of "employee."

Similarly, extending the coverage of the Act to such workers is consistent with the Act's avowed purpose of encouraging and protecting the collective-bargaining process. See *Hearst Publications, Inc., supra*, at 126. As this Court has previously recognized: "[A]cceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens; and employment of illegal aliens under such conditions can diminish the effectiveness of labor unions." *De Canas* v. *Bica*, 424 U. S. 351, 356–357 (1976). If undocumented alien employees were excluded from participation in union activities and from protections against employer intimidation, there would be created a subclass of workers without a comparable stake in the collective goals of their legally resident co-workers, thereby eroding the unity of all the employees and impeding effective collective bargaining. See *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 33 (1937). Thus, the Board's categorization of undocumented aliens as protected employees furthers the purposes of the NLRA.

## B

Counterintuitive though it may be, we do not find any conflict between application of the NLRA to undocumented aliens and the mandate of the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U. S. C. § 1101 *et seq.* This Court has observed that "[t]he central concern of the INA is with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *De Canas* v. *Bica*, 424 U. S., at 359. The INA evinces "at best evidence of a peripheral concern with employment of illegal entrants." *Id.*, at 360. For whatever reason, Congress has not adopted provisions in the INA mak-

ing it unlawful for an employer to hire an alien who is present or working in the United States without appropriate authorization. While it is unlawful to "concea[l], harbo[r], or shiel[d] from detection" any alien not lawfully entitled to enter or reside in the United States, see 8 U. S. C. § 1324(a)(3), an explicit proviso to the statute explains that "employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." *Ibid.* See *De Canas* v. *Bica, supra,* at 360, and n. 9. Moreover, Congress has not made it a separate criminal offense for an alien to accept employment after entering this country illegally. See 119 Cong. Rec. 14184 (1973) (remarks of Rep. Dennis). Since the employment relationship between an employer and an undocumented alien is hence not illegal under the INA, there is no reason to conclude that application of the NLRA to employment practices affecting such aliens would necessarily conflict with the terms of the INA.

We find persuasive the Board's argument that enforcement of the NLRA with respect to undocumented alien employees is compatible with the policies of the INA. A primary purpose in restricting immigration is to preserve jobs for American workers; immigrant aliens are therefore admitted to work in this country only if they "will not adversely affect the wages and working conditions of the workers in the United States similarly employed." 8 U. S. C. § 1182(a)(14). See S. Rep. No. 748, 89th Cong., 1st Sess., 15 (1965). Application of the NLRA helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment. If an employer realizes that there will be no advantage under the NLRA in preferring illegal aliens to legal resident workers, any incentive to hire such illegal aliens is correspondingly lessened. In turn, if the demand for undocumented aliens declines, there may then be fewer incentives for aliens themselves to

enter in violation of the federal immigration laws. The Board's enforcement of the NLRA as to undocumented aliens is therefore clearly reconcilable with and serves the purposes of the immigration laws as presently written.

### III

Accepting the premise that the provisions of the NLRA are applicable to undocumented alien employees, we must now address the more difficult issue whether, under the circumstances of this case, petitioners committed an unfair labor practice by reporting their undocumented alien employees to the INS in retaliation for participating in union activities. Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U. S. C. § 158(a)(3). The Board, with the approval of lower courts, has long held that an employer violates this provision not only when, for the purpose of discouraging union activity, it directly dismisses an employee, but also when it purposefully creates working conditions so intolerable that the employee has no option but to resign—a so-called "constructive discharge." See, e. g., NLRB v. Haberman Construction Co., 641 F. 2d 351, 358 (CA5 1981) (en banc); Cartwright Hardware Co. v. NLRB, 600 F. 2d 268, 270 (CA10 1979); J. P. Stevens & Co. v. NLRB, 461 F. 2d 490, 494 (CA4 1972); NLRB v. Holly Bra of California, Inc., 405 F. 2d 870, 872 (CA9 1969); Atlas Mills, Inc., 3 N. L. R. B. 10, 17 (1937). See also 3 T. Kheel, Labor Law § 12.05[1][a] (1982).

Petitioners do not dispute that the antiunion animus element of this test was, as expressed by the lower court, "flagrantly met." 672 F. 2d, at 601. "The record is replete with examples of Sure-Tan's blatantly illegal course of conduct to discourage its employees from supporting the Union." Id., at 601–602. Petitioners contend, however, that their

conduct in reporting the undocumented alien workers did not force the workers' departure from the country; instead, they argue, it was the employees' status as illegal aliens that was the actual "proximate cause" of their departure. See Brief for Petitioners 13–15.

This argument is unavailing. According to testimony by an INS agent before the ALJ, petitioners' letter was the sole cause of the investigation during which the employees were taken into custody. This evidence was undisputed by petitioners and amply supports the ALJ's conclusion that "but for [petitioners'] letter to Immigration, the discriminatees would have continued to work indefinitely." 234 N. L. R. B., at 1191. And there can be little doubt that Surak foresaw precisely this result when, having known about the employees' illegal status for some months, he notified the INS only after the Union's electoral victory was assured. See *supra*, at 887; 672 F. 2d, at 601.

We observe that the Board quite properly does not contend that an employer may never report the presence of an illegal alien employee to the INS. See, *e. g.*, *Bloom/Art Textiles, Inc.*, 225 N. L. R. B. 766 (1976) (no violation of Act for employer to discharge illegal alien who was a union activist where the evidence showed that the reason for the discharge was not the employee's protected collective activities, but the employer's concern that employment of the undocumented worker violated state law). The reporting of any violation of the criminal laws is conduct which ordinarily should be encouraged, not penalized. See *In re Quarles*, 158 U. S. 532, 535 (1895).[6] It is only when the evidence establishes

---

[6] It is by now well established, however, that if the reason asserted by an employer for a discharge is pretextual, the fact that the action taken is otherwise legal or even praiseworthy is not controlling. See *NLRB v. Transportation Management, Inc.*, 462 U. S. 393, 398 (1983). If the Board finds, as it did here, that the otherwise legitimate reason asserted by the employer for a discharge is a pretext, then the nature of the pretext is immaterial, even where the pretext involves a reliance on state or local

that the reporting of the presence of an illegal alien employee is in retaliation for the employee's protected union activity that the Board finds a violation of § 8(a)(3).   Absent this specific finding of antiunion animus, it would not be an unfair labor practice to report or discharge an undocumented alien employee.   See *Bloom/Art Textiles, Inc., supra.*   Such a holding is consistent with the policies of both the INA and the NLRA.

Finally, petitioners claim that this Court's recent decision in *Bill Johnson's Restaurants, Inc.* v. *NLRB,* 461 U. S. 731 (1983), mandates the conclusion that their request for enforcement of the federal immigration laws is an aspect of their First Amendment right "to petition the Government for a redress of grievances" and therefore may not be burdened under the guise of enforcing the NLRA.[7]   In *Bill Johnson's Restaurants,* the Court held that an employer's filing of a state court suit against its employees seeking damages and injunctive relief for libelous statements and injury to its business is not an enjoinable unfair labor practice unless the suit is filed for retaliatory purposes and lacks a reasonable basis. The Court stressed that the right of access to courts for re-

---

laws. See, *e. g., New Foodland, Inc.,* 205 N. L. R. B. 418, 420 (1973) (discriminatory discharge of underage employee).   Indeed, as we noted in *NLRB* v. *Erie Resistor Corp.,* 373 U. S. 221, 230, n. 8 (1963), even evidence of a "good-faith motive" for a discriminatory discharge "has not been deemed an absolute defense to an unfair labor practice charge."

[7] Under § 10(e) of the Act, "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."   29 U. S. C. § 160(e).   We may consider petitioners' First Amendment argument, although not raised before the Board, because the intervening, substantial change in controlling law occasioned by *Bill Johnson's Restaurants* qualifies as an "extraordinary circumstanc[e]."   See, *e. g., NLRB* v. *Lundy Manufacturing Corp.,* 286 F. 2d 424, 426 (CA2 1960).   As that intervening decision issued six months after the filing of the petition for certiorari in this case, we similarly countenance petitioners' presentation of their First Amendment challenge for the first time before this Court.   See, *e. g., Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313, 320–321, and n. 6 (1971).

dress of wrongs is an aspect of the First Amendment right to petition the government, concluding that the NLRA must be construed in such a way as to be "sensitive" to these First Amendment values. *Id.*, at 741. The Court also noted that the States had a compelling interest in maintaining domestic peace by providing employers with such civil remedies for tortious conduct during labor disputes. If the Board were allowed to enjoin a state lawsuit simply because of retaliatory motive, the employer would "be totally deprived of a remedy for an actual injury," and the strong state interest in providing for such redress would therefore be undermined. *Id.*, at 742.

The reasoning of *Bill Johnson's Restaurants* simply does not apply to petitioners' situation. The employer in that case, though similarly motivated by a desire to discourage the exercise of NLRA rights, was asserting in state court a personal interest in its *own* reputation that was protected by state law. If the Court had upheld the Board in the case, it would have left the employer with no forum in which to pursue a remedy for an "actual injury." *Id.*, at 741. The First Amendment right protected in *Bill Johnson's Restaurants* is plainly a "right of access to the courts . . . 'for redress of alleged wrongs.'" *Ibid.* Petitioners in this case, however, have not suffered a comparable, legally protected injury at the hands of their employees. Petitioners did not invoke the INS administrative process in order to seek the redress of any wrongs committed against them. Cf. *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508 (1972). Indeed, private persons such as petitioners have no judicially cognizable interest in procuring enforcement of the immigration laws by the INS. Cf. *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 619 (1973).

Finally, *Bill Johnson's Restaurants* was concerned about whether the Board's interpretation of the NLRA would work to pre-empt the *State* from providing civil remedies for conduct touching interests "'deeply rooted in local feeling and responsibility.'" 461 U. S., at 741 (quoting *San Diego*

*Building Trades Council* v. *Garmon*, 359 U. S. 236, 244 (1959)). Here, where there is no conflict between the Board's unfair labor practice finding and any asserted state interest, such federalism concerns are simply not at stake. In short, *Bill Johnson's Restaurants* will not support petitioners' efforts to avoid their obligations under the NLRA by reporting their employees to the INS.

## IV

There remains for us to consider petitioners' challenges to the remedial order entered in this case. Petitioners attack those portions of the Court of Appeals' order which modified the Board's original order by providing for an irreducible minimum of six months' backpay for each employee and by detailing the language, acceptance period, and verification method of the reinstatement offers.[8] We find that the Court of Appeals exceeded its narrow scope of review in imposing both these modifications.

## A

Section 10(c) of the Act empowers the Board, when it finds that an unfair labor practice has been committed, to issue an order requiring the violator to "cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies" of the NLRA. 29 U. S. C. § 160(c). The Court has repeatedly interpreted this statutory command as vesting in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial

---

[8] Petitioners do not challenge the cease and desist order imposed by the Board and affirmed by the Court of Appeals. Under such an order, petitioners will be subject to contempt sanctions should they again resort to the discriminatory tactics employed here. Nor do petitioners appear to challenge the court's modifications of the Board's remedial order conditioning acceptance of the reinstatement offers and the accrual of any backpay upon the discharged employees' legal presence in this country. See n. 12, *infra*.

review. See, *e. g.*, *NLRB* v. *J. H. Rutter-Rex Mfg. Co.*, 396 U. S. 258, 262–263 (1969); *Fibreboard Paper Products Corp.* v. *NLRB*, 379 U. S. 203, 216 (1964); *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 194 (1941). Although the courts of appeals have power under the Act "to make and enter a decree . . . modifying, and enforcing as so modified" the orders of the Board, 29 U. S. C. §§ 160(e), (f), they should not substitute their judgment for that of the Board in determining how best to undo the effects of unfair labor practices:

> "Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." *Phelps Dodge Corp.*, *supra*, at 194.

See also *NLRB* v. *Seven-Up Bottling Co.*, 344 U. S. 344, 346 (1953) (power to fashion remedies "is for the Board to wield, not for the courts").

Here, the Court of Appeals impermissibly expanded the Board's original order to provide that each discriminatee would receive backpay for at least six months on the ground that "six months is a reasonable assumption" as to the "minimum [time] during which the discriminatees might reasonably have remained employed without apprehension by INS, but for the employer's unfair labor practice." 672 F. 2d, at 606. We agree with petitioners that this remedy ordered by the Court of Appeals exceeds the limits imposed by the NLRA.[9]

---

[9] JUSTICE BRENNAN asserts that since the Board has "fully acquiesced" in the Court of Appeals' remedy, the case should be reviewed as if the Board itself had developed the remedial order. See *post*, at 907. This argument misses the mark on two levels. First, our traditional deference to such remedial orders is premised upon our appreciation that the Board has duly considered and brought to bear its "special competence" in fashioning appropriate relief in any given unfair labor practice case. See *NLRB* v. *J. Weingarten, Inc.*, 420 U. S. 251, 265–266 (1975). Given the

Not only did the court overstep the limits of its own reviewing authority, see *NLRB* v. *Seven-Up Bottling Co.*, *supra*, at 346–347,[10] but it also effectively compelled the Board to take action that simply does not lie within the Board's own powers.  Under § 10(c), the Board's authority to remedy unfair labor practices is expressly limited by the requirement that its orders "effectuate the policies of the Act." Although this rather vague statutory command obviously permits the Board broad discretion, at a minimum it encompasses the requirement that a proposed remedy be tailored to the unfair labor practice it is intended to redress.  Quite early on, the Court established that "the relief which the statute empowers the Board to grant is to be adapted to the situation which calls for redress."  *NLRB* v. *MacKay Radio & Telegraph Co.*, 304 U. S. 333, 348 (1938).  See D. McDowell & K. Huhn, NLRB Remedies for Unfair Labor Practices 8–15 (1976).  Of course, the general legitimacy of the backpay order as a means to restore the situation "as nearly as possible, to that which would have obtained but for the illegal discrimination," *Phelps Dodge Corp.*, 313 U. S., at 194, is by now beyond dispute.  Yet, it remains a cardinal, albeit frequently unarticulated assumption, that a backpay remedy must be sufficiently tailored to expunge only the *actual*, and not merely *speculative*, consequences of the unfair labor practices.  *Id.*, at 198 ("[O]nly actual losses should be made

---

disparity between the Board's original order and the Court of Appeals' modified order, that premise is patently inapplicable to this case.  Moreover, the Board's mere acquiescence in the Court of Appeals' remedial order simply cannot correct the order's main deficiency—its development in the total absence of any record evidence as to the circumstances of the individual employees.

[10] In imposing a minimum backpay award, the Court of Appeals usurped the delegated function of the Board to decide how best to appraise the relevant factors that determine a just backpay remedy.  The proper course for a reviewing court that believes a Board remedy to be inadequate is to remand the case to the Board for further consideration.  See *supra*, at 899; *NLRB* v. *Food Store Employees*, 417 U. S. 1, 10 (1974).

good . . .").   To this end, we have, for example, required that the Board give due consideration to the employee's responsibility to mitigate damages in fashioning an equitable backpay award.   See, *e. g.*, *NLRB* v. *Seven-Up Bottling Co.*, *supra*, at 346; *Phelps Dodge Corp.* v. *NLRB*, *supra*, at 198.   Likewise, the Board's own longstanding practice has been to deduct from the backpay award any wages earned in the interim in another job, see *Pennsylvania Greyhound Lines, Inc.*, 1 N. L. R. B. 1, 51 (1935), enf'd, 91 F. 2d 178 (CA3 1937), rev'd on other grounds, 303 U. S. 261 (1938).

By contrast, the Court of Appeals' award of a minimum amount of backpay in this case is not sufficiently tailored to the actual, compensable injuries suffered by the discharged employees.   The court itself admitted that although it sought to recompense the discharged employees for their lost wages, the actual 6-month period selected was "obviously conjectural."   672 F. 2d, at 606.   The court's imposition of this minimum backpay award in the total absence of record evidence as to the circumstances of the individual employees constitutes pure speculation and does not comport with the general reparative policies of the NLRA.[11]

---

[11] We are also mindful that, prior to the instant case, the Board itself had never claimed the power given it here by the Court of Appeals.   To our knowledge, the Board has never attempted to impose a minimum backpay award that the employer must pay regardless of the actual evidence as to such issues as an employee's availability for work or his efforts to secure comparable interim employment.   In fact, in this very case, the Board had already rejected as "unnecessarily speculative" the ALJ's recommendation that a 4-week minimum period of backpay be awarded the discharged employees.   234 N. L. R. B., at 1187.   The Board now argues that the Court of Appeals' backpay award involves no greater speculation than that which is normally involved in reconstructing what would have happened to certain employees but for their discriminatory discharge.   See, *e. g.*, *NLRB* v. *Superior Roofing Co.*, 460 F. 2d 1240 (CA9 1972) *(per curiam); Buncher* v. *NLRB*, 405 F. 2d 787 (CA3 1968), cert. denied, 396 U. S. 828 (1969).   In each of these cases, however, the courts enforced the Board's orders upon finding that the Board, in the course of compliance proceedings, had applied to particular facts a reasonable formula for determining the probable

We generally approve the Board's original course of action in this case by which it ordered the conventional remedy of reinstatement with backpay, leaving until the compliance proceedings more specific calculations as to the amounts of backpay, if any, due these employees. This Court and other lower courts have long recognized the Board's normal policy of modifying its general reinstatement and backpay remedy in subsequent compliance proceedings as a means of tailoring the remedy to suit the individual circumstances of each discriminatory discharge. See *NLRB* v. *J. H. Rutter-Rex Mfg. Co.*, 396 U. S., at 260; *Nathanson* v. *NLRB*, 344 U. S. 25, 29–30 (1952); *Trico Products Corp.* v. *NLRB*, 489 F. 2d 347, 353–354 (CA2 1973). Cf. *Teamsters* v. *United States*, 431 U. S. 324, 371 (1977) (individual Title VII claims to be resolved at remedial hearings held by District Court on remand). These compliance proceedings provide the appropriate forum where the Board and petitioners will be able to offer concrete evidence as to the amounts of backpay, if any, to which the discharged employees are individually entitled. See *NLRB* v. *Mastro Plastics Corp.*, 354 F. 2d 170 (CA2 1965), cert. denied, 384 U. S. 972 (1966); 3 NLRB Casehandling Manual § 10656 *et seq.* (1977) (preparation of backpay specification).

Nonetheless, as the Court of Appeals recognized, the implementation of the Board's traditional remedies at the com-

---

length of employment and compensation due and had permitted the employer to come forward with evidence mitigating liability. See, *e. g.*, *NLRB* v. *Superior Roofing Co.*, *supra*, at 1240–1241 (upholding use of a "seniority formula" to compute the earnings of a "representative employee" in a reasonable approximation of discharged roofer's earnings). In the instant case, the Court of Appeals "estimated" an appropriate period of backpay without any evidence whatsoever as to the period of time these particular employees might have continued working before apprehension by the INS and without affording petitioners any opportunity to provide mitigating evidence. In the absence of relevant factual information or adequate analysis, it is inappropriate for us to conclude, as does JUSTICE BRENNAN, that the Court of Appeals had estimated the proper minimum backpay award "with a fair degree of precision," see *post*, at 909.

pliance proceedings must be conditioned upon the employees' legal readmittance to the United States. In devising remedies for unfair labor practices, the Board is obliged to take into account another "equally important Congressional objectiv[e]," *Southern S.S. Co.* v. *NLRB*, 316 U. S. 31, 47 (1942)—to wit, the objective of deterring unauthorized immigration that is embodied in the INA. By conditioning the offers of reinstatement on the employees' legal reentry, a potential conflict with the INA is thus avoided. Similarly, in computing backpay, the employees must be deemed "unavailable" for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States. Cf. 3 NLRB Casehandling Manual §§ 10612, 10656.9 (1977).[12]

The Court of Appeals assumed that, under these circumstances, the employees would receive no backpay, and so

---

[12] Conditioning the offers of reinstatement on the employees' legal reentry and deeming the employees "unavailable" during any period when they were not lawfully present are requirements that were in fact imposed by the Court of Appeals in this case, and hence fully accepted by the Board. See 672 F. 2d, at 606 ("Consistent with our requirement that there be reinstatement only if the discriminatees are legally present and permitted by law to be employed in the United States we modify the Board's order so as to make clear (1) that [except for the minimum backpay award] in computing backpay discriminatees will be deemed unavailable for work during any period when not lawfully entitled to be present and employed in the United States . . ."); App. to Pet. for Cert. 32a (modified order). Contrary to JUSTICE BRENNAN's assertion, see *post*, at 910, the Board does not argue that it would exempt these employees from its "unavailability" policy because their unavailability is directly attributable to the employer's own unfair labor practice. The Board refers to this limited exception to its normal rule solely to counter petitioners' suggestion that the minimum backpay award is somehow logically "inconsistent" with normal Board policies in calculating backpay. See Brief for Respondent 45, n. 44. The Board has clearly indicated its agreement with these portions of the Court of Appeals' remedial order by specifically noting that petitioners do not challenge these parts of the order, see *id.*, at 43, by limiting its own argument to the minimum backpay award issue alone, see *id.*, at 43–46, and, most importantly, by asking that the judgment below be affirmed in its entirety.

awarded a minimum amount of backpay that would effectuate the underlying purposes of the Act by providing some relief to the employees as well as a financial disincentive against the repetition of similar discriminatory acts in the future. 672 F. 2d, at 606.   We share the Court of Appeals' uncertainty concerning whether any of the discharged employees will be able either to enter the country lawfully to accept the reinstatement offers or to establish at the compliance proceedings that they were lawfully available for employment during the backpay period.   The probable unavailability of the Act's more effective remedies in light of the practical workings of the immigration laws, however, simply cannot justify the judicial arrogation of remedial authority not fairly encompassed within the Act.   Any perceived deficiencies in the NLRA's existing remedial arsenal can only be addressed by congressional action.[13]   By directing the Board to impose a minimum backpay award without regard to the employees' actual economic losses or legal availability for work, the

---

[13] According to JUSTICE BRENNAN, the Court stands guilty today of creating a "disturbing anomaly" by, on the one hand, holding that undocumented aliens are "employees" within the meaning of the Act and so entitled to bring an unfair labor practice claim, but then, on the other hand, holding that these same employees are "effectively deprived of any remedy . . . ."   See post, at 911.   This argument completely ignores the fact that today's decision leaves intact the cease and desist order imposed by the Board, see n. 7, supra, one of the Act's traditional remedies for discriminatory discharge cases.  Were petitioners to engage in similar illegal conduct, they would be subject to contempt proceedings and penalties.   This threat of contempt sanctions thereby provides a significant deterrent against future violations of the Act.   At the same time, we fully recognize that the reinstatement and backpay awards afford both more certain deterrence against unfair labor practices and more meaningful relief for the illegally discharged employees.   Nevertheless, we remain bound to respect the directives of the INA as well as the NLRA and to guard against judicial distortion of the statutory limits placed by Congress on the Board's remedial authority.   Any other solution must be sought in Congress and not the courts.

Court of Appeals plainly exceeded its limited authority under the Act.[14]

## B

The Court of Appeals similarly exceeded its limited authority of judicial review by modifying the Board's order so as to require petitioners to draft the reinstatement offers in Spanish and to ensure verification of receipt. While such requirements appear unobjectionable in that they constitute a rather trivial burden, they represent just the type of informed judgment which calls for the Board's superior expertise and long experience in handling specific details of remedial relief. See, *e. g., NLRB* v. *J. Weingarten, Inc.,* 420 U. S. 251, 266–267 (1975); *NLRB* v. *Erie Resistor Corp.,* 373 U. S., at 236. If the court believed that the Board had erred in failing to impose such requirements, the appropriate course was to remand back to the Board for reconsideration. *NLRB* v. *Food Store Employees,* 417 U. S. 1 (1974). Such action "best respects the congressional scheme investing the Board and not the courts with broad powers to fashion remedies that will effectuate national labor policy." *Id.,* at 10; see 2 T. Kheel, Labor Law § 7.04[3][e] (1984).

The court's requirement that the reinstatement offers be held open for four years is vulnerable to similar attack. The court simply had no justifiable basis for displacing the Board's discretionary judgment about the proper time period for acceptance of the reinstatement offers. Rather than enlarging the Board's remedial order in this fashion, the court was required to remand for the Board to consider the alterna-

---

[14] In light of our disposition of this issue, we find it unnecessary to consider petitioners' claim that the minimum backpay awards are "punitive," and hence beyond the authority of the Board under *Republic Steel Corp.* v. *NLRB,* 311 U. S. 7, 9–12 (1940). We may thus avoid entering into what we have previously deemed "the bog of logomachy" as to what is "remedial" and what is "punitive." *NLRB* v. *Seven-Up Bottling Co.,* 344 U. S. 344, 348 (1953).

tive grounds on which the court believed the offers to have been deficient and to decide upon new forms for the reinstatement offers. *NLRB* v. *Food Store Employees, supra.*

## V

For the reasons given above, we reverse the judgment of the Court of Appeals insofar as it imposed a minimum backpay award and mandated certain specifics of the reinstatement offers. We therefore remand the case to the Court of Appeals with instructions to remand it back to the Board to permit formulation of an appropriate remedial order consistent with this Court's opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, concurring in part and dissenting in part.

I fully agree with the Court to the extent it holds, first, that undocumented aliens are "employees" within the meaning of § 2(3) of the National Labor Relations Act (NLRA), 29 U. S. C. § 152(3), and, second, that petitioners plainly violated § 8(a)(3) of the Act, 29 U. S. C. § 158(a)(3), when they reported their undocumented alien employees to the Immigration and Naturalization Service (INS) in retaliation for participating in union activities. Accordingly, I join Parts I, II, and III of the Court's opinion. However, because the Court's treatment of the appropriate remedy departs so completely from our prior cases, I dissent from Part IV of the opinion.

The Court's first mistake is to ignore the fact that the Board, rather than seeking a remand, has expressly urged that we affirm the 6-month backpay and reinstatement remedy provided in the Court of Appeals' enforcement order, because it is fully satisfied that the court's order "effectuates the purposes of the NLRA." Brief for Respondent 11. Of course, it is generally true, as the Court observes, *ante,* at 900, n. 10, that the proper course for a reviewing court that

finds a Board remedy inadequate is to remand to the Board, rather than attempting in the first instance to fashion its own remedy. Such a rule protects the Board's congressionally delegated power "to fashion remedies that will effectuate national labor policy" from usurpation by the courts. *NLRB* v. *Food Store Employees*, 417 U. S. 1, 10 (1974). In this case, however, the Board has fully acquiesced in the remedy developed by the Court of Appeals and, consequently, no purpose would be served by remanding to the Board for further consideration of the remedy question. We should instead approach this case as if the Board had developed the remedial order on its own motion and the Court of Appeals had simply enforced that order.

The Court compounds this initial error by devising a new standard for reviewing the propriety of remedies ordered under the NLRA. At the outset of its discussion, the Court correctly states that we have consistently interpreted § 10(c) of the NLRA, 29 U. S. C. § 160(c), as "vesting in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." *Ante*, at 898–899. The Court goes on, however, to concoct a new standard of review, which considers whether the terms of a remedial order are "sufficiently tailored" to the unfair labor practice it is intended to redress. *Ante*, at 901. Applying its newly minted standard to this case, the Court finds that the remedial order challenged here involved the imposition of requirements on petitioners that "d[o] not lie within the Board's own powers." *Ante*, at 900. Our prior cases, however, provide no support whatsoever for this new standard. Indeed, we have explained that "[w]hen the Board . . . makes an order of restoration by way of backpay, the order 'should stand *unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.*'" *NLRB* v. *Seven-Up Bottling Co.*, 344 U. S. 344, 346–347 (1953) (emphasis added) (quoting

*Virginia Electric & Power Co.* v. *NLRB,* 319 U. S. 533, 540 (1943)). And we have repeatedly emphasized that a court has only limited authority to review remedial orders developed by the Board to effectuate the purposes of the Act. See *NLRB* v. *J. H. Rutter-Rex Mfg. Co.,* 396 U. S. 258, 262–263 (1969); *NLRB* v. *Seven-Up Bottling Co., supra,* at 346; *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 194 (1941). Because of that consistent pattern of deference, our cases have never before considered whether a particular remedy is "sufficiently tailored" to the harm it seeks to cure.

If the appropriate standard of review is applied to this case, it is clear that the judgment of the Court of Appeals should be affirmed in its entirety as the Board urges. It is undisputed that absent petitioners' illegal conduct, the five employees involved here would certainly have continued working for and receiving wages from petitioners for some period of time beyond February 18, 1977—the date on which they were discriminatorily discharged. It is equally clear, therefore, that each of these employees suffered some loss of income that was directly attributable to petitioners' unfair labor practices. Accordingly, given such circumstances, it is perfectly reasonable that the Board should in the exercise of its broad remedial powers under § 10(c) of the Act fashion a remedy designed to restore those employees "as nearly as possible [to the situation] that . . . would have obtained but for the illegal discrimination," *Phelps Dodge, supra,* at 194, including reinstatement and an award of appropriate backpay. Such a remedial order is in no sense "punitive," since it serves the dual purposes of making whole those employees who were injured by petitioners' conduct and of vindicating the important public purposes of the NLRA. *Virginia Electric & Power Co.* v. *NLRB, supra,* at 543. The reinstatement order and the award of a minimum of six months' backpay ordered by the Court of Appeals and supported here by the Board reflect, in my view, a wholly reasonable effort to effectuate those purposes.

The Court, however, identifies what it considers to be two significant problems with that order. First, the 6-month backpay award, in the Court's view, rests solely on "conjecture" and "speculation" and is therefore not "sufficiently tailored to the actual, compensable injuries suffered by the discharged employees." *Ante*, at 901. Second, the Court insists that "in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." *Ante*, at 903.

With respect to the Court's first assertion, it is clear that the Board's decision to support the backpay award ordered by the Court of Appeals rests squarely upon its own judgment that this award estimates with a fair degree of precision the period that these employees would have continued working for petitioners had petitioners not reported them to the INS. Indeed, as the Board points out, such an award is no more speculative or conjectural than those developed in other situations commonly confronted by the Board in which it is not clear how long an employment relationship would have continued in the absence of an unfair labor practice. See, *e. g., Buncher* v. *NLRB*, 405 F. 2d 787, 789–790 (CA3 1968), cert. denied, 396 U. S. 828 (1969); *NLRB* v. *Superior Roofing Co.*, 460 F. 2d 1240, 1241 (CA9 1972); *NLRB* v. *Miami Coca-Cola Bottling Co.*, 360 F. 2d 569, 572–573 (CA5 1966).[1]

---

[1] Under the guidelines developed by the General Counsel of the NLRB, the period covered by a backpay award generally includes the time from the discriminatory discharge until the discriminatee either rejects a bona fide offer of reinstatement or is reinstated. See NLRB Casehandling Manual § 10530.1(a) (1977). In this case, of course, because the five undocumented alien employees accepted voluntary departure as a substitute for deportation immediately following their illegal discharge, this normal method of calculating the period of backpay cannot be applied. Instead, just as in *Buncher* v. *NLRB*, an estimate must be made of the income these employees would have earned but for petitioners' unfair labor practices. As the Board has explained, the 6-month period adopted by the Court of

As to the second assertion, the Court provides no explanation for its conclusion that these employees were "unavailable" for work, as a matter of law, following their return to Mexico and that any entitlement to backpay that might otherwise have accrued during that period is therefore tolled. In the first place, such a holding overlooks the Board's longstanding practice of forgiving periods of unavailability that are due to the employer's own illegal conduct. See, *e. g.*, *Graves Trucking Inc.*, 246 N. L. R. B. 344, 345 (1979), enf'd as modified, 692 F. 2d 470, 474–477 (CA7 1982); *Moss Planning Mill Co.*, 103 N. L. R. B. 414, enf'd, 206 F. 2d 557 (CA4 1953); cf. *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U. S. 557, 566–567 (1981) ("[I]t does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury . . . it has itself inflicted"). In this case, as the Board explains, see Brief for Respondent 45, n. 44, these employees would not necessarily have been found unavailable, because their immediate departure from the country was plainly and directly attributable to petitioners' illegal conduct. Thus, by presuming to foreclose a remedy that the Board itself is prepared to grant, the Court today is far more guilty of usurping the remedial functions of the Board than was the Court of Appeals.[2]

---

Appeals reflects a reasonable estimate, under the particular circumstances of this case, of the earnings that these employees lost as a result of petitioners' illegal conduct.

[2] The Court of Appeals expressed concern that some of the discharged alien employees might not be able to establish—because of their undocumented immigration status—that they were lawfully available for reemployment during the normal backpay period between their illegal discharge and acceptance of reinstatement, and would therefore not be entitled to claim backpay. See 672 F. 2d 592, 606 (CA7 1982); App. to Pet. for Cert. 28a. But, in order to ensure that petitioners bore some responsibility for the "discriminatory act[s] which caused these employees to lose their jobs," the court concluded that a minimum backpay award was necessary to effectuate the purposes of the NLRA. 672 F. 2d, at 606; see also App. to Pet. for Cert. 28a. As the Board explains in its brief, such a

More importantly, the Court never addresses the disturbing anomaly it creates by holding in Parts II and III that undocumented aliens are "employees" within the meaning of the Act, and thereby entitled to all of the protections that come with that status, but then finding in Part IV that these same alien employees are effectively deprived of any remedy, despite a clear violation of the NLRA by their employer. In Part II, the Court concludes that undocumented aliens must be considered employees protected under the Act, notwithstanding the fact that they are not lawfully entitled to be present in the United States while they are employed here. *Ante*, at 891–894. But that holding is then flatly contradicted by the Court's assertion in Part IV that these alien employees must be considered "unavailable" for work, and therefore not entitled to backpay under the NLRA, during any period when they were not lawfully entitled to be present in the United States. *Ante*, at 903. If these undocumented alien employees are entitled, as the Court finds they are, to press an unfair labor practice claim before the Board on the basis of their discriminatory discharge by petitioners, and if the Board may properly find that an unfair labor practice was committed, then I fail to see why these same employees should be stripped of the normal remedial protections of the Act.

The contradiction in the Court's opinion is total. In explaining why enforcement of the NLRA with respect to undocumented alien employees is compatible with national immigration policy, the Court observes:

> "Application of the NLRA helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien

---

backpay award is wholly consistent with its own longstanding policy that "where unavailability is due to an illness, injury, or other event that would not have occurred but for the unlawful discharge, backpay liability will not be tolled for that period." Brief for Respondent 45, n. 44.

employees who are not subject to the standard terms of employment. If an employer realizes that there will be no advantage under the NLRA in preferring illegal aliens to legal resident workers, any incentive to hire such illegal aliens is correspondingly lessened." *Ante*, at 893.

But the force of this logic is blunted by the Court's decision to restrict drastically the remedies available to undocumented alien employees. Once employers, such as petitioners, realize that they may violate the NLRA with respect to their undocumented alien employees without fear of having to recompense those workers for lost backpay, their "incentive to hire such illegal aliens" will not decline, it will increase. And the purposes of both the NLRA and the Immigration and Naturalization Act (INA) that are supposedly served by today's decision will unquestionably be undermined.[3]

Moreover, permitting backpay awards in these circumstances creates little risk of undermining the policies of the INA. As long as offers of reinstatement are conditioned upon the employee's legal reentry to this country, any incentive to return illegally to the United States that such a Board-ordered remedy might otherwise create is, as the Court itself properly notes, see *ante*, at 902–903, effectively removed.

Finally, with respect to the Court of Appeals' requirement that the offers of reinstatement remain open for four years to permit the discharged alien employees a reasonable time to

---

[3] In its struggle to justify the contradiction it has created, the Court recognizes, as it must, that "reinstatement and backpay awards afford both more certain deterrence against unfair labor practices and more meaningful relief for the illegally discharged employees." *Ante*, at 904, n. 13. Given that fact, the Board's resolute position that reinstatement and backpay awards are necessary to effectuate the policies of the NLRA, and the fact that the policies of the INA do not require the Court's result, I am at a loss to understand why the Court insists upon denying these employees the normal remedies that the Board has seen fit to provide.

seek legal reentry to the United States, that these offers be drafted in Spanish, and that receipt of the offers be verified, it should be noted that all of these remedies serve, in the judgment of the Board, "reasonably [to] effectuate the purposes of the Act in the circumstances of this case." Brief for Respondent 47. Although, as I have said, I generally agree with the Court that reviewing courts should remand to the Board rather than unilaterally imposing modifications of this sort, see *ante*, at 905–906, it seems clear that in this case the Board has fully accepted these requirements as measures that further national labor policy and accommodate the competing purposes of the INA. Under those circumstances, I see no reason to require a remand. Accordingly, I would affirm the judgment of the Court of Appeals.

JUSTICE POWELL, with whom JUSTICE REHNQUIST joins, concurring in part and dissenting in part.

I dissent from the Court's finding that the illegal aliens involved in this case are "employees" within the meaning of that term in the National Labor Relations Act. It is unlikely that Congress intended the term "employee" to include—for purposes of being accorded the benefits of that protective statute—persons wanted by the United States for the violation of our criminal laws. I therefore would hold that the illegal alien workers are not entitled to any remedy. Given the Court's holding, however, that they are entitled to the protections of the NLRA, I join Part IV of the Court's opinion.*

---

*Although the difference in the remedy approved by the Court and that urged in JUSTICE BRENNAN's opinion is essentially one of degree, the former provides less incentive for aliens to enter and reenter the United States illegally.