TOWN & COUNTRY ELECTRIC, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

International Brotherhood of Electrical Workers, Local 292, Intervenor/Respondent.

TOWN & COUNTRY ELECTRIC, INC.; Ameristaff Personnel Contractors, Ltd., Respondents,

v.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

International Brotherhood of Electrical Workers, Local 292, Intervenor/Petitioner.

Nos. 92–3911, 93–1218.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1993.

Decided Aug. 31, 1994.

James K. Pease, Jr., Madison, WI, argued (James K. Pease, Jr. and Douglas E. Witt, on the brief), for petitioner/cross-respondent.

Marilyn O'Rourke, Washington, DC, argued (Frederick C. Havard and Marilyn O'Rourke, and Gen. counsel Jerry M. Hunter, Yvonne T. Dixon, Nicholas E. Karatinos and Aileen A. Armstrong, on the brief), for respondent/cross-petitioner, NLRB.

Stephen D. Gordon, Minneapolis, MN, argued (Stephen D. Gordon and Paul W. Iversen, on the brief), for intervenor Intern. Broth. of Elec. Workers, Local 292.

Before RICHARD S. ARNOLD, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

WOLLMAN, Circuit Judge.

The National Labor Relations Board found that Town & Country Electric, Inc. had violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(1) & (3), by discriminating against two full-time union organizers and nine other union members. Town & Country petitions for review of the Board's decision and order, and the Board cross petitions for enforcement of its order. Because we find that the union organizers and the other union members were not "employees" within the meaning of section 2(3) of the Act, 29 U.S.C. § 152(3), and therefore not entitled to the Act's protection, we deny enforcement of the order.

## I.

In early September 1989, Town & Country, a large nonunion electrical contractor from Appleton, Wisconsin, obtained a contract to do electrical work at Boise Cascade's paper mill in International Falls, Minnesota. After being awarded the contract, Town & Country learned that Minnesota law requires electrical contractors to employ one electrician licensed by the State of Minnesota for every two unlicensed electricians working at a job site in the state. None of Town & Country's electricians had a Minnesota license. To help it recruit Minnesota-licensed electricians, Town & Country retained Ameristaff Personnel Contractors, Ltd., a temporary employment agency from Green Bay, Wisconsin. Ameristaff advertised in a Minneapolis newspaper for licensed journeymen electricians. Ameristaff prescreened those who responded to the advertisement and scheduled interviews for seven applicants at a Minneapolis hotel on September 7.

Ron Sager, Town & Country's human resources manager, Dennis Defferding, one of its project managers, and Steven Buelow, Ameristaff's president, flew from Appleton to Minneapolis to conduct the interviews. Due to inclement weather, they arrived at the hotel one and one-half hours late. Of the seven applicants with scheduled interviews, only one, Gary Weseman, was present. Also present for interviews, however, were approximately one dozen members of Local 292 of the International Brotherhood of Electrical Workers, including two full-time paid union officials. Officials of Local 292 had learned of the job advertisement and had encouraged union members to respond and, if hired, to organize the job site.

Sager and Defferding interviewed union member Craig Jones first because he said that he had to leave early. They then interviewed Weseman and offered him a job. Following these two interviews, Buelow informed Sager that none of the remaining applicants had prescheduled interviews and that from their applications they appeared to be union members. Sager then informed the applicants that he had decided to interview only applicants who had scheduled interviews because he had to return to Appleton to attend an important meeting that afternoon. When Sager asked all those without appointments to leave, Malcolm Hansen protested that he had called Ameristaff's office earlier that day and had been told to report to the hotel for an interview. After Buelow had called his office and confirmed that Hansen had indeed called Ameristaff after they had left for Minneapolis, Sager interviewed Han-

sen. Sager hired Hansen, knowing that he was a union member. Although interviewed and selected by Town & Country, Hansen was technically employed by Ameristaff as a temporary employee for referral to Town & Country.

On September 12, Town & Country's crew, including Hansen, began work at Boise Cascade's mill. At the job site, Hansen announced to the crew that he was there to organize for the union. Hansen talked continuously to his coworkers about the benefits of the union and relentlessly solicited them to sign with the union, even though they indicated that they were not interested. Hansen's crewmates complained to their foreman about Hansen's nonstop talking as well as his poor workmanship and low productivity.

After the crew had begun work at the job site, Sager learned that under Minnesota law an electrical contractor could not use temporary employees from an employment agency; rather, all employees had to be directly employed by the contractor itself. Sager informed Buelow about this law and about Hansen's low productivity and poor workmanship; Buelow then discharged Hansen on September 14. Hansen asked Sager if Town & Country would hire him directly, but Sager refused to do so.

Affirming the Administrative Law Judge's decision, the Board found that Town & Country had violated sections 8(a)(1) and 8(a)(3) of the Act by refusing to interview the two union officials and eight other union members because of their union affiliation and by refusing to retain Hansen because of his union activity at the job site. *Town & Country Elec., Inc.*, 309 N.L.R.B. 1250, 1992 WL 390106 (1992). In so holding, the Board found that the two union organizers and the other union members, including Hansen, were employees within the meaning of section 2(3) of the Act. In its petition, Town & Country argues that this finding was improper.

## II.

■ The Act "confers rights only on *employees*, not on unions or their nonemployee organizers." *Lechmere, Inc. v. NLRB,*

502 U.S. 527, ——, 112 S.Ct. 841, 845, 117 L.Ed.2d 79 (1992). Applicants for employment, however, have long been considered to be employees under the Act. *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 181–88, 61 S.Ct. 845, 846–50, 85 L.Ed. 1271 (1941). Although the task of defining the term "employee" has been assigned primarily to the Board as the agency created by Congress to administer the Act, *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 891, 104 S.Ct. 2803, 2808, 81 L.Ed.2d 732 (citing *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 130, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944)), the Board's construction of the term is not immune from judicial review, *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971). We will uphold the Board's interpretation only if it is reasonable. *Sure–Tan,* 467 U.S. at 891, 104 S.Ct. at 2808; *Pittsburgh Plate Glass,* 404 U.S. at 166, 92 S.Ct. at 391.

In this case, we must decide whether two separate but related classes of individuals were employees within the meaning of the Act. We first consider whether the two full-time union organizers were statutory employees and then decide the same issue for the other nine union members, including Hansen.

### A.

■ The circuits are split on whether paid union organizers are employees under the Act. In *H.B. Zachry Co. v. NLRB,* 886 F.2d 70, 72 (4th Cir.1989), the Fourth Circuit, joining the Sixth Circuit, *NLRB v. Elias Brothers Big Boy, Inc.,* 327 F.2d 421, 427 (6th Cir.1964), held that a union organizer is not a bona fide employee within the meaning of section 2(3). Zachry had refused to hire a paid full-time union organizer who had applied for work, upon the union's instruction, to organize Zachry's employees. Had the organizer been hired, he would have remained concurrently employed and supervised by the union. The union would have made up any shortfall in his salary, continued to make payments for his fringe benefits, and paid for his travel expenses and any other living expenses related to the job. In reach-

ing its holding, the court stated that the "plain meaning of the term 'employee' contemplates an employee working under the direction of a single employer. The term plainly does not contemplate someone working for two different employers at the same time and for the same working hours." *Zachry,* 886 F.2d at 73.

On the other hand, in *Willmar Electric Service, Inc. v. NLRB,* 968 F.2d 1327, 1329–31 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1252, 122 L.Ed.2d 651 (1993), the D.C.Circuit, agreeing with the Second Circuit, *NLRB v. Henlopen Manufacturing Co.,* 599 F.2d 26, 30 (2d Cir.1979), reached a contrary decision. *See also Escada (USA) Inc. v. NLRB,* 970 F.2d 898 (3d Cir.1992) (enforcing the Board's order without an opinion). Willmar had refused to hire a job applicant who was employed by a union when he applied, sought the job for the purpose of organizing Willmar's work force, planned to retain an employment relationship with the union, and planned to return to being a full-time union employee. Rejecting *Zachry*'s holding, the court held that the Board could reasonably determine that an individual "who is employed simultaneously by a union and a company is an 'employee'" under section 2(3). *Willmar,* 968 F.2d at 1330–31.

The Fourth Circuit has recently adhered to its decision in *Zachry,* expressly declining to revisit it in the light of *Willmar. Ultrasystems Western Constructors, Inc. v. NLRB,* 18 F.3d 251, 255 (4th Cir.1994).

■ We find *Zachry* to be more persuasive than *Willmar.* Section 2(3)'s definition of "employee,"[1] provides little help in deciding the issue before us. *See Nationwide Mutual Ins. Co. v. Darden,* —— U.S. ——, ——, 112 S.Ct. 1344, 1349, 117 L.Ed.2d 581 (1992); *Zachry,* 886 F.2d at 72. Section 2(3) merely defines employee to mean "any em-

ployee" and outlines several types of employment not covered by the statute. When a federal statute does not helpfully define the term "employee," we infer that "'Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.'" *Darden,* —— U.S. at ——, 112 S.Ct. at 1348 (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 2172, 104 L.Ed.2d 811 (1989)).

Under common law, an agent has a duty to act solely for the benefit of his principal in all matters connected with his agency. Restatement (Second) of Agency § 387 (1957). More specifically, an agent is subject to a duty not to act on behalf of a person or entity whose interests conflict with those of the principal in matters in which the agent is employed. *Id.* § 394. Pursuant to this obligation, a person may be the servant of two masters at one time only if service to one does not involve abandonment of or conflict with service to the other. *Id.* § 226. Ordinarily, however, the control a master can properly exercise over the conduct of a servant prevents simultaneous service for two independent employers. *Id.* cmt a.

The Board argues that working simultaneously for the union as a paid organizer and for a nonunion employer does not involve a conflict of interest. The Board contends that the Act is founded on a belief that an employee may legitimately give allegiance to both a union and an employer.

Were this a case involving a typical job applicant, we might well agree that an employee may be simultaneously loyal to his union and to his nonunion employer. The two union organizers, however, were not typical applicants. They were not in search of a job; they already had one. The organizers wanted to enter Town & Country's work

1. Section 2(3) provides in full: The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined. 29 U.S.C. § 152(3).

force not for financial gain, but to organize its workers. When a union official applies for a position only to further the union's interests, we believe that an inherent conflict of interest exists. In this situation, the union official will follow the mandates of the union, not his new employer. If the union commands him to increase his organizational activities at his second employer's expense, he will do so. If the union asks him to quit working for his second employer, he will do so. Additionally, a union organizer in this position has a reduced incentive to be a good employee for his second employer. If he is terminated, he simply returns to his full-time union job. Indeed, he may even relish being discharged, because he then can file an unfair labor practice charge, claiming that he was terminated because of his organizing efforts. Accordingly, we find that the two full-time paid union organizers were not employees under the Act.

## B.

 We further find that the union members who applied, including Hansen, were not employees entitled to the Act's protection. Like the union organizers, these applicants were also under Local 292's control. Although not full-time organizers, they were encouraged by Local 292 to apply and to organize Town & Country's employees if hired. The union would pay those hired the difference between union scale and Town & Country's wages as well as their travel expenses.[2] Most important, these applicants were subject to Local 292's job salting organizing resolution. Pursuant to this resolution, Local 292 members may work for nonunion employers only if they work for organizational purposes. In particular, the resolution provides that the union's business manager is "empowered to authorize members to seek employment by nonsignatory contractors for the purpose of organizing the unorganized." The resolution further provides that "such members, when employed by nonsignatory employers, shall promptly and diligently carry out their organizing assignments, and leave the employer or job imme-

diately upon notification." We find this last provision controlling, for third-party control over a putative employee's job tenure, in contrast to, say, an employee-initiated decision to engage in a work stoppage, is inimical to, and inconsistent with, the employer-employee relationship. Fidelity to the principles and goals of one's chosen labor organization is to be expected and is of course protected by the Act. On the other hand, traditional common-law principles governing the establishment of the employer-employee relationship should not be jettisoned in an effort to broaden the protections of the Act beyond those which it was intended to provide. Town & Country may not deny employment to those who, in addition to performing the work they were employed to do, zealously seek to persuade their fellow employees to join their union, but it should not be required to place and retain on its payroll those whose continued presence on the job will be determined by an entity other than itself. Accordingly, we hold that Town & Country committed no unfair labor practice in refusing to interview the two union organizers and the other union members.

Having found that none of the alleged discriminatees were employees under the Act and that therefore no violations of the Act occurred, we need not consider Town & Country's remaining two arguments: that the Board improperly approved the ALJ's use of an irrebuttable presumption that all nonunion employers are unlawfully motivated to discriminate against individuals who are affiliated with a union, and that the Board failed to follow precedent that permits employers to prohibit solicitation during work time.

Enforcement of the order is denied.

---

**2.** Indeed, for Hansen's organizational efforts at the Boise Cascade job site, he received almost $1100 from the union, as compared to $725 from Ameristaff.