United States Court of Appeals,

Fifth Circuit.

No. 92-4391.

ELECTRONIC DATA SYSTEMS CORPORATION, and its Wholly Owned Subsidiary, Security Couriers, Inc., Petitioners-Cross-Respondents,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.

March 12, 1993.

Petitions for Review of Order of National Labor Relations Board.

Before REAVLEY, SMITH and DeMOSS, Circuit Judges.

REAVLEY, Circuit Judge:

An Administrative Law Judge (ALJ) found that Electronic Data Systems (EDS) violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1) and 158(a)(3) by: threatening to discharge employees, disciplining an employee, revoking employee privileges, and ultimately discharging several employees for union organizing activities. The ALJ recommended, *inter alia,* that EDS reinstate the employees to their jobs as courier drivers for the *same* corporate division of EDS for which the drivers worked at the time EDS discharged them. A three-member panel of the National Labor Relations Board (NLRB) adopted the ALJ's findings and recommendation in all relevant respects. In its petition for review, EDS argues that NLRB erred in its factual determinations and that NLRB ordered an illegal remedy. NLRB cross-petitions for enforcement of its order. We refuse to disturb NLRB's factual determinations, but we only enforce part of NLRB's order. NLRA § 10(e), 29 U.S.C. § 160(e). Because the record does not yet support the exact remedial relief ordered by NLRB, we remand this case to NLRB for reconsideration of the reinstatement aspect of its order. NLRA § 10(f), 29 U.S.C. § 160(f).

## I. BACKGROUND

A. The Corporate Actors: EDS, MTech, and SCI

Until April 1988, MTech Corporation was a large data-processing company with one of many branches in Jacksonville, Texas (MTJ). MTech's business was to collect documents from banks in

the evening, process them, and return them to the banks in the morning, thus performing both data-processing and courier services. MTech provided these services according to long-term, lump-sum contracts that it executed with several banks. Neither MTech nor MTJ was licensed as a common carrier by the Texas Railroad Commission (TRC). Consequently, the transportation part of the bank customer charges was significantly less than courier service alone at the tariff rate set by TRC.[1]

In February 1988, MTech bought Security Couriers, Inc. (SCI), which has a branch in Tyler, Texas. Tyler is approximately 30 miles from Jacksonville. MTech purchased SCI from Martin Coben, who remained Chief Executive Officer of SCI as a wholly-owned subsidiary of MTech. SCI performs the same courier service for bank documents as MTJ, but SCI performs no data processing services. SCI holds a TRC common-carrier license and charges its customers TRC rates. SCI had begun doing some courier work for MTJ by 1987. Coben continuously showed an interest in doing all of MTJ's courier work. But both before and after MTech purchased SCI, MTJ's management was unwilling to pay SCI the higher tariff rates that TRC required SCI to charge.

In April 1988, EDS bought MTech and placed D. Benjamin Sims in charge of integrating MTech into EDS. Thus, decisions as to how SCI should be integrated into EDS also fell to Sims. SCI retained its separate name and identity after becoming a wholly-owned subsidiary of EDS. MTJ did not retain a name and identity separate from EDS, so for clarity we refer to the Jacksonville data-processing business that EDS bought from MTech as MTJ-EDS.

B. THE ADVENT OF UNION ORGANIZING AND ITS SUPPRESSION

In late August 1988, Paul Stanwood, an MTJ-EDS driver, contacted a United Auto Workers (UAW) representative named John Colliflower and inquired about joining UAW. As word spread of driver unionization, MTJ-EDS's low-level supervisors questioned drivers about union activity, threatened their jobs if they unionized, and eliminated a 15-minute paid car-inspection allowance because of the drivers' contacts with UAW. MTJ-EDS's management received a letter from

---

[1] If MTJ charged a bank for courier service, MTJ levied a flat rate of $10.00 per stop. A record exhibit shows that TRC rates vary with weight and distance, but are always greater than $10.00 per stop for the distances and weights encountered by MTJ.

Colliflower on September 15, 1988, which advised MTJ-EDS that its drivers were in the process of unionization and that UAW would respond to any managerial restraint of the unionization process with legal action.

Some time before September 23, 1988, Sims decided to merge MTJ-EDS's courier operations into SCI. He did this by subcontracting all of MTJ-EDS's courier work to SCI. On October 11, 1988, EDS terminated all of MTJ-EDS's 23 drivers, and 20 SCI drivers from various SCI locations outside Jacksonville temporarily took over the MTJ-EDS's routes. SCI subsequently hired 23 drivers to cover MTJ-EDS's former routes and combined four or five of MTJ-EDS's 22 or 23 routes into extant SCI routes. SCI hired seven of the former MTJ-EDS drivers into its expanded Tyler operation. This operation requires trips to and from MTJ-EDS in Jacksonville where MTJ-EDS continues data-processing work for its customers.

C. NLRB'S DECISION AND ORDER

On October 13, 1988, UAW filed unfair labor practice charges against EDS. EDS now admits that it violated the NLRA by threats, disciplinary action, and pay reduction, but it continues to deny that it consolidated MTJ-EDS into SCI to prevent MTJ-EDS's drivers from unionizing. Coben and Sims both testified that they decided to consolidate MTJ-EDS's courier operations with those of SCI in July 1988, before the advent of any union activity. They say that they opted for consolidation to 1) eliminate duplication in employees and equipment, and 2) remedy the illegality of having MTJ-EDS's courier services performed by an unlicensed entity.

NLRB disbelieved the testimony of EDS executives as to why they merged MTJ-EDS's courier operations into SCI. NLRB found that Coben continuously wanted to take MTJ-EDS's business and made plans for doing so once EDS bought MTech in April 1988, but that Sims did not accept Coben's plan until after Sims recognized that consolidation would rid EDS of the unionizing activities at MTJ-EDS. NLRB ordered, *inter alia,* EDS to revoke the subcontracting arrangement between MTJ-EDS and SCI, restore the courier operation at Jacksonville with all of the courier work associated with MTJ-EDS's data-processing business, and offer the terminated MTJ-EDS drivers their

jobs and back pay.[2]

EDS filed a petition for review in this court and NLRB filed a cross-application for enforcement of its order.

## II. DISCUSSION

EDS argues that NLRB erred in determining that union animus was a motivating factor in EDS' decision to consolidate the courier operations of MTJ-EDS and SCI. EDS also argues that even if union animus was a motivating factor in its consolidation decision, NLRB's remedy for this NLRA violation is illegal. Given our review standard, we refuse to disturb NLRB's fact findings. But because the record does not support all aspects of NLRB's remedy, we remand this case for further consideration.

### A. VIOLATION

When union animus represents a "substantial or motivating factor" in an employer's decision to discharge an employee, the employer violates NLRA §§ 8(a)(1) and 8(a)(3). *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983).[3] "Since an employer rarely admits that it discharged an employee for engaging in protected concerted activities, the NLRB may rely on circumstantial evidence in determining an employer's

---

[2]The ALJ recommended that NLRB order EDS to take all steps necessary to make the MTJ-EDS courier operation comply with the Texas Motor Carrier Act (TMCA), TEX.REV.CIV.STAT.ANN. art. 911b (Vernon 1964 and 1993 Supp.). NLRB decided that the evidence of MTJ-EDS's illegality under the TMCA was inconclusive, so NLRB adopted the ALJ's recommended order after deleting its provision that EDS make MTJ-EDS comply with the TMCA.

[3]NLRA section 8(a)(1) prohibits employer interference, restraint, and coercion in the exercise of employees' rights to form, join, or assist labor organizations. 29 U.S.C. § 158(a)(1). NLRA section 8(a)(3) prohibits discrimination in hiring and tenure based on membership in a labor organization. 29 U.S.C. § 158(a)(3).

NLRB's General Counsel bears the initial burden of establishing violations of §§ 8(a)(1) and 8(a)(3). Under *Transportation Management* and NLRA § 10(c), 29 U.S.C. § 160(c), NLRB's General Counsel must prove by a preponderance of the evidence that union animus was a substantial or motivating factor in adverse actions taken by the employer. NLRB's General Counsel establishes a violation by meeting this burden unless the *employer* proves by a preponderance of the evidence that it would have taken the same adverse action even if, hypothetically, the employer had not been motivated by union animus. *Id.* 462 U.S. at 400-403, 103 S.Ct. at 2474-75.

actual motive." *NLRB v. Delta Gas, Inc.,* 840 F.2d 309, 313 (5th Cir.1988). Here, NLRB inferred violative motivation in EDS' discharge decision from evidence of 1) collateral acts that were admittedly motivated by union animus and 2) the timing of Sims' decision to consolidate MTJ-EDS and SCI. EDS asserts that NLRB erred in finding that EDS harbored a violative motivation in discharging MTJ-EDS's couriers.

Congress commands us to uphold NLRB's fact findings if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). This standard is not

> intended to negative the function of [NLRB] as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace [NLRB's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.* Congress has merely made it clear that a reviewing court is not barred from setting aside [an NLRB] decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [NLRB's] view.

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). We find substantial evidence in the record to support NLRB's decision that union animus was a motivating factor in EDS' decision to discharge MTJ-EDS's couriers.

EDS does not dispute the fact that its low-level supervisors used threats, discipline, and privilege removal to discourage MTJ-EDS's drivers from voting for UAW affiliation. And EDS does not dispute the fact that it discharged MTJ-EDS's couriers within one month after learning of the couriers' organizing efforts. We have previously held that "[w]hile the record does permit a competing, perhaps even equal, inference of a legitimate basis for discipline, [NLRB] could reasonably infer an improper motivation given the *timing of the discipline and the circumstances of the employer's antiunion campaign." NLRB v. Brookwood Furniture, Div. of U.S. Industr.,* 701 F.2d 452, 467 (5th Cir.1983) (emphasis added).

EDS argues that timing and collateral union activity cannot control in this case because the record overwhelmingly demonstrates that EDS *decided* to consolidate MTJ-EDS's courier operations with SCI in July 1988, well before the advent of union activity at MTJ-EDS. We disagree with EDS' assessment of what the record demonstrates. Sims testified that he decided to consolidate MTJ-

EDS's courier operation into SCI in July 1988 and that he communicated this decision to Coben. However, NLRB discredited Sims' testimony. EDS also relies on an August 3, 1988 memorandum from Coben to Sims in which Coben reports that he "assigned Tom Harenchar the duties of converting [the MTJ-EDS] operation to [SCI's] format...." But nothing else in the August 3 memorandum unambiguously establishes the meaning of a "format conversion." Also, this language does not necessarily represent evidence of a prior consolidation decision *by Sims,* who testified that he was ultimately responsible for making any consolidation decision.

Moreover, Harenchar himself testified that the financial details of any consolidation had not been resolved between SCI and MTJ-EDS by September 15, 1988. And Al Albritton, the SCI subordinate to whom Harenchar delegated the responsibility of investigating MTJ-EDS's courier operations, did not even provide Harenchar with the most basic information about MTJ-EDS's courier operations (number of couriers and cars) until August 18, 1988. Albritton's August 18 memorandum unequivocally states that Albritton believed that a final decision to consolidate was yet to be made. Thus, the record contains ample evidence that contravenes Sims' testimony that he finally decided to consolidate MTJ-EDS and SCI in July 1988.

Besides containing this contradicting evidence, the record does not bear out the two reasons that EDS gives for having finally decided to consolidate in July 1988. First, EDS explains that it wanted to consolidate to save the costs of duplicitous courier operations. But the record does not contain *any* reference to an analysis of the most economically efficient way for EDS to provide courier service to the customers of both SCI and MTJ-EDS. Indeed, the record does not show that the executives in charge of any consolidation efforts even knew rudimentary details about MTJ-EDS's courier operation until Albritton submitted his memorandum on August 18. NLRB may legitimately question EDS' economic explanation for consolidation when there is scant evidence that EDS studied the economic impact of consolidation before purportedly deciding to consolidate.

Second, EDS explains that it decided to remove courier operations from MTJ-EDS almost immediately upon purchasing MTech because TRC never licensed MTJ-EDS as a common carrier. EDS' executives testified that they consolidated MTJ-EDS's courier operations with SCI in strict

obedience to the TMCA, which forbids unlicensed businesses from transporting goods for hire without a license. *See* TEX.REV.CIV.STAT.ANN. art. 911b § 3. Assuming *arguendo* that MTJ-EDS' courier operation was illegal under Texas law, this explanation for EDS' consolidation decision is highly suspicious, and we could not fault NLRB for considering the explanation a pretext.

We understand that SCI is a licensed common carrier and MTJ-EDS is not, and that some of the policies furthered by the TMCA are safety promotion and money savings through restrictive licensure. *See id.* at § 22b. But if EDS transferred MTJ-EDS' courier responsibilities to SCI out of respect for the TMCA, it unlikely would have ignored a coequal TMCA policy: "that discrimination in rates charged may be eliminated." *Id.* To implement this policy, Texas accords TRC authority to establish mandatory rates that common carriers must charge their customers. *Id.* at § 4(a)(1) (Vernon Supp.1993). EDS' executives acknowledge that both before and after EDS purchased MTech, SCI charged its customers rates specified by TRC and MTJ-EDS charged its customers significantly less than TRC-specified rates. MTJ-EDS operated pursuant to several long-term contracts with banks, under which the banks paid MTJ-EDS a lump sum for both data-processing and courier services. When EDS transferred MTJ-EDS's courier responsibilities under these contracts to SCI, ostensibly to comply with the TMCA, it made *no effort* to comply with the rate requirements of the TMCA by asking MTJ-EDS's contract banks for the money required to be paid for courier services. Instead, EDS permitted SCI to show that it had charged the required rates on SCI's books by an accounting transfer from the monies received on MTJ-EDS's contracts with East Texas banks. Thus, EDS simply earned less on the data-processing part of the MTJ-EDS contracts so that SCI could show that it charged the required rates on its books. But this accounting maneuver between sister corporations is obviously not what Texas law contemplates when it requires couriers to charge *customers* certain rates.[4] *See generally id.* at § 4(a)(1) (according TRC authority to fix "maximum and minimum rates, fares and charges" for all regulated motor carriers). If, as EDS claims, it was convinced that companies which provide courier services in connection with other services are regulated by the

---

[4] Of course, we do not advance an opinion on whether the TMCA governs MTJ-EDS' courier operations. We only think that if the TMCA governs, EDS does not satisfy the requirements of the TMCA unless it charges its customers TRC rates.

TMCA, we believe that EDS would have recognized that a simple transfer of MTJ-EDS's courier responsibilities to SCI would not necessarily eliminate legal problems with MTJ-EDS's courier contracts.

We therefore disagree with EDS' assessment of what the record demonstrates, and find that substantial record evidence supports NLRB's findings. The record contains evidence that some EDS officials considered consolidating MTJ-EDS's courier operation into SCI well before union organizing began at MTJ-EDS, but the record also supports NLRB's decision that union animus was a motivating factor when EDS finally decided to consolidate. Substantial record evidence also supports NLRB's finding that EDS did not establish by a preponderance of the evidence that, even if EDS hypothetically harbored no union animus, it would still have discharged the Jacksonville couriers on October 11, 1988.

B. REMEDY

As remedy for EDS' improper consolidation, NLRB ordered EDS to, *inter alia,* sever the contractual relationship that permitted SCI to perform the MTJ-EDS courier work, restore the MTJ-EDS courier operation, and offer to reinstate the MTJ-EDS drivers with back pay. In *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 104 S.Ct. 2803 (1984), the Court held that, although Congress grants NLRB broad remedial authority to counter unfair labor practices, NLRB must respect "equally important Congressional objectiv[es]" in fashioning remedies. *Id.* at 903, 104 S.Ct. at 2814-15 (citations omitted). EDS reads *Sure-Tan* to prohibit NLRB's remedy in this case because, according to EDS, the order requires the reinstatement of a courier operation that is illegal under Texas law.

We reject EDS' contention for several reasons. The record contains insufficient evidence that MTJ-EDS's courier operation was illegal. Also, NLRB stated that it would address any legality problems at compliance proceedings. *See id.* at 902, 104 S.Ct. at 2814 ("This Court and ... lower courts have long recognized [NLRB's] normal policy of modifying its general reinstatement and back pay remedy in subsequent compliance proceedings as a means of tailoring the remedy to suit the individual circumstances of each discriminatory discharge."). Moreover, this case is distinguishable from *Sure-Tan* because, if MTJ-EDS's courier operation was illegal, the illegality in rate-charges

persists even after consolidation with SCI. In *Sure-Tan,* NLRB ordered an employer to change from an indisputably legal employer status to a status that violated the Immigration and Nationality Act. *See id.* at 903, 104 S.Ct. at 2814-15.

Though we disagree with EDS' specific arguments regarding NLRA violation and remedy, we believe that the record does not yet support the remedy ordered by NLRB. Throughout this case, EDS' general position has been that it intended to consolidate MTJ-EDS's courier operations with those of SCI for reasons having nothing to do with labor organization. While the record supports NLRB's finding that union animus was a motivating factor in EDS' decision to consolidate on October 11, 1988, it does not yet support an inference that, but for UAW involvement, EDS would *never* have consolidated MTJ-EDS's courier operations with those of SCI.

"Under [NLRA] § 10(c), [NLRB's] authority to remedy unfair labor practices is expressly limited by the requirement that its orders "effectuate the policies of the Act.' " *Id.* at 900, 104 S.Ct. at 2813. At a minimum, section 10(c) "encompasses the requirement that a proposed remedy be tailored to the unfair labor practice it is intended to redress." *Id.* On the present record, NLRB's remedy is not tailored to the union animus found at EDS because it does not consider whether, when, or how EDS would have eventually consolidated its courier business in the Tyler/Jacksonville area. We also note that NLRB could create a remedy that makes MTJ-EDS's former couriers whole with back pay and reinstatement and still avoid restricting EDS in its development of its courier business in Tyler and Jacksonville.[5]

This case closely resembles *Baker Mfg. Co. v. NLRB,* 759 F.2d 1219 (5th Cir.1985). The *Baker* court found that the record supported NLRB's determination that the employer violated the NLRA by terminating the employment of several employees for their union activities. *Id.* at 1223. The court then turned to the question of whether NLRB exceeded its authority in fashioning a remedy for the violation when NLRB ordered the reinstatement of two employees to positions that the employer had discontinued. *Id.* The court explained:

---

[5]For example, NLRB could order that MTJ-EDS's former couriers be offered jobs in Jacksonville working for EDS in another capacity or as drivers for SCI.

The basic purpose of a reinstatement order is to restore the economic status quo that would have existed but for the employer's illegal activities. However, it is not intended to lock the employer into maintaining that status quo without due consideration of economic realities at the time the remedy is effectuated. [In *Baker,* the employer] has alleged that these [two] positions are not economically justifiable. The record supports the conclusion that these jobs were abolished as part of the [employer's] scheme to eliminate the union activists. [Although] there is no substantial evidence that [the employer] ever seriously considered the economic factors affecting these jobs prior to terminating [the employees,] it might well be true that these positions are superfluous today. If so, the [employer] should not be compelled to re-create and maintain unnecessary positions for an indeterminate period if less extreme and equally effective remedies are available.

*Id.* at 1223-24 (citations omitted).

"The proper course for a reviewing court that believes an [NLRB] remedy to be inadequate is to remand the case to [NLRB] for further consideration." *Sure-Tan,* 467 U.S. at 900 n. 10, 104 S.Ct. at 2813 n. 10; *accord Baker,* 759 F.2d at 1224. Like the *Baker* court, we think that, in fashioning a remedy, NLRB should account for what EDS eventually would have done regarding consolidation absent its antiunion motivation.

## III. CONCLUSION

EDS only petitioned for review of NLRB's findings and order as they pertain to EDS' discharge of MTJ-EDS's drivers. NLRB cross-petitioned for enforcement of its entire order. We thus enforce NLRB's order except as that order specifies affirmative actions that EDS must take both to sever business relationships between EDS and SCI and to reinstate the MTJ-EDS couriers. For treatment of that excepted part of the order, we remand this case to NLRB for reconsideration of an appropriate remedy.

ENFORCED IN PART AND REMANDED.