ULTRASYSTEMS WESTERN
CONSTRUCTORS, INCORPORATED,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

The International Brotherhood of Boiler-
makers, Iron Ship Builders, Black-
smiths, Forgers and Helpers, AFL–CIO,
Intervenor.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ULTRASYSTEMS WESTERN
CONSTRUCTORS, INCORPORATED,
Respondent,

The International Brotherhood of Boiler-
makers, Iron Ship Builders, Black-
smiths, Forgers and Helpers, AFL–CIO,
Intervenor.

Nos. 93–1265, 93–1453.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 27, 1993.

Decided March 3, 1994.

**ARGUED:** Warren Malcolm Davison, Littler, Mendelson, Fastiff & Tichy, Baltimore, Maryland, for Petitioner. David Arthur Fleischer, Senior Attorney, National Labor Relations Board, Washington, D.C., for Respondent. Michael James Stapp, Blake & Uhlig, P.A., Kansas City, Kansas, for Intervenor.

**ON BRIEF:** Roger D. Meade, Thomas P. Dowd, Littler, Mendelson, Fastiff & Tichy, Baltimore, Maryland, for Petitioner. Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Deputy General Counsel, Nicholas E. Karatinos, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, Washington, D.C., for Respondent. Michael T. Manley, Blake & Uhlig, P.A., Kansas City, Kansas, for Intervenor.

Before NIEMEYER and HAMILTON, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

NIEMEYER, Circuit Judge:

In connection with the efforts of the International Brotherhood of Boilermakers, Ironship Builders, Blacksmiths, Forgers & Helpers, and the United States Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry (hereafter collectively, "the Union") to organize the employees of Ultrasystems Western Constructors, Inc. ("Ultrasystems"), the National Labor Relations Board found that Ultrasystems violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) & (3). The Board found that Ultrasystems refused to consider and to hire 66 applicants presented by the Union at two California construction sites because of the company's anti-union animus. One of the applicants was a full-time paid union organizer. The Board's remedies included an order directing Ultrasystems to make the applicants "whole," to "offer all employee-appli-

cants ... employment in the positions for which they applied, or ... substantially equivalent positions," and to post a notice at all of Ultrasystems' construction sites nationwide acknowledging violations of the Act and advising employees of their labor law rights.

Ultrasystems petitioned for review, contending that (1) under our ruling in *H.B. Zachry Co. v. NLRB,* 886 F.2d 70 (4th Cir. 1989), the company should not be required to hire the paid union organizer; and (2) the remedies with respect to the remaining 65 applicant-employees are too broad for the violations found. The Board filed a cross-petition for enforcement of its order. Because the facts of the case fall squarely within our holding in *Zachry,* we deny enforcement of the order with respect to the paid union organizer. While we affirm the Board's finding that the company violated the NLRA in handling the 65 other applicants, we remand the case with directions to the Board to tailor more closely its order to match the discrimination found.

## I

Ultrasystems is a large, national contractor which constructs power plants, including steam generated electrical power plants. In 1988 it was engaged in two construction projects, one in Rocklin, California, and another in Bakersfield, California. These plants were completed sometime in 1989.

The employees of Ultrasystems were not, during the period, represented by any union, and Ultrasystems regarded itself as a "merit shop" because it hired on merit without regard to union affiliation. Its project managers had "followings," groups of laborers who followed experienced managers from job to job around the country. The sites at both Rocklin and Bakersfield were staffed in large part by members of the project managers' followings.

In 1988, the Union targeted Ultrasystems for unionization, selecting the two California sites for its efforts. The Union assigned William Creeden, a full-time union employee, to be in charge of the organizing effort. In furtherance of the effort to organize the employees of Ultrasystems, the Union sent applications to the project managers at both sites in the summer and fall of 1988 when Ultrasystems was in need of welders. It sent 14 applications of union members, including that of Creeden, to the Rocklin site and 52 applications of union members to the Bakersfield site. The management of Ultrasystems was aware of the organizing effort and took various steps to resist it. Ultimately, none of the 66 union-member applicants were hired.

On the complaint of the Union, the National Labor Relations Board ("the Board") charged Ultrasystems with violations of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a)(1) & (3). Following a 13–day trial, the Administrative Law Judge ("ALJ") found that "the evidence is clear that [Ultrasystems] has in place an unlawful policy designed to screen from employment individuals whom it deems, rightly or wrongly, to be likely to engage in union activity." It found anti-union animus in connection with the handling of the 66 applications and, in particular, in connection with its refusal to hire Creeden, the paid union organizer. It also found a number of other NLRA violations involving current employees, which are not at issue on this appeal. The ALJ required Ultrasystems "to pay backpay to those individuals, determined at a compliance proceeding, to have been denied employment at either Rocklin or Bakersfield because of their union background." In addition, the ALJ ordered the company to post at the Rocklin and Bakersfield sites a "Notice to Employees" acknowledging the past violations by Ultrasystems and detailing specific employee rights to organize and engage in collective action. In the event that the two projects were completed, it required Ultrasystems to mail the notice to the employees who had worked at the two projects and to post copies at Ultrasystems' current project sites.

The Board adopted the rulings, findings, and conclusions of the ALJ, with a modification in the remedial order. Rejecting any suggestion that the reinstatement remedy was not practicable for violations by companies in the construction industry, the Board required Ultrasystems to offer employment

as well as backpay to all 66 union applicants whom Ultrasystems refused to consider or to hire. In particular, it required the company to:

Make whole all employee-applicants at Rocklin and Bakersfield for any losses they may have suffered by reason of the discriminatory refusal to consider them for employment.... Offer all employee-applicants at Rocklin and Bakersfield employment in the positions for which they applied, or if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges to which they would have been entitled if they had not been discriminated against by the Respondent.

Ultrasystems filed this petition for a review of the Board's order, and the Board cross-petitioned for enforcement of its order.

## II

Ultrasystems first contends that our decision in *H.B. Zachry Co. v. NLRB*, 886 F.2d 70 (4th Cir.1989), requires that we deny enforcement of the Board's order with respect to William Creeden, because he was not a bona fide applicant for employment and therefore was not protected as an employee under the Act. The Board found that Ultrasystems refused employment of Creeden solely because he was a union organizer and therefore violated sections 8(a)(3) and (1) of the Act. It directed that Ultrasystems offer Creeden employment with backpay.

In *Zachry*, we held that an applicant for employment who, if hired, had intended to remain on the union payroll as a union organizer during the period of employment was not a bona fide applicant for employment within the meaning of the NLRA. The record there showed that the union intended to make up any shortfall in the organizer's salary, to continue payments for his insurance and pension, and to pay daily transportation and living expenses related to the employment. The organizer conceded that he sought employment for the purpose of entering the plant and organizing its employees. The Board in *Zachry* found that the company violated the Act by refusing to hire the union organizer, but we refused enforcement of the

Board's order. While we recognized that a bona fide applicant for employment is in fact a prospective employee and therefore should be treated as an "employee" as that term is defined in the Act, *see Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), we concluded that the union organizer cannot be considered a bona fide applicant for employment with the company.

Our decision was based, at bottom, on the conclusion that an application from a union organizer, applying for work at the direction of the union employer, was "qualitatively different from that of a bona fide applicant." 886 F.2d at 74. Because the union organizer would work for the employer only to carry out his duties as a union organizer and would be paid by the union at the same time, he was not "in search of a job" with the usual expectations of employment. Rather than having the nature of his employment relationship determined by his performance and the needs of his employment, the union organizer's application was submitted only for temporary employment, the nature and duration of which would be dictated by the organizing effort. Policy considerations also guided the holding in *Zachry*. We observed that permitting a paid union organizer to obtain the protections of the Act as an employee would upset the careful balance struck by Congress in the relationships between employers and unions. *See* 886 F.2d at 74–75. The organizer's responsibilities for performing his union job during the course of the employer's work at the employer's site might, we concluded, violate various rights of employees to self-determination and rights of employers to control access to their own property.

The factual prerequisites for the holding in *Zachry* appear as strong here as they were in *Zachry*. Indeed the parties entered into a stipulation of fact which seemed to anticipate a further review of *Zachry*. They agreed:

That, at the time Mr. Creeden applied for employment with Ultrasystems—with Respondent, rather, he was employed by the International Union, and that he intended to remain an employee of the International Union if he became employed by Ultrasystems. And furthermore, that the Interna-

tional intended to continue him in employment, notwithstanding any hiring that might take place of Mr. Creeden by Ultrasystems.

In view of this stipulation and a similar disclosure by Creeden on his application form, the ALJ stated that he was not convinced that Creeden was a bona fide applicant and that our decision in *Zachry* "makes a great deal of sense." Nevertheless, he observed that he was compelled to follow the Board's contrary decisions in *Sunland Construction Co.*, 309 NLRB No. 180 (1992), and *Town & Country Electric, Inc.*, 309 NLRB No. 181 (1992), and the Board affirmed.

Because it has factually been established in this case that Creeden intended to remain under the employ of his union while working for Ultrasystems, and that his employment for Ultrasystems would be in furtherance of his union employment, we hold that he loses the protection which the Act provides to a bona fide applicant for employment with the employer. *See Zachry.* Although we have been invited to revisit *Zachry* in light of the later decision in *Willmar Elec. Serv., Inc. v. NLRB*, 968 F.2d 1327 (D.C.Cir.1992) (holding that one who is employed simultaneously by a union and a company is an "employee" as defined by the Act, and reserving "to another day" when union ties under such arrangement create a risk of disloyalty sufficient to justify the company's refusal to hire the applicant), *cert. denied*, —— U.S. ——, 113 S.Ct. 1252, 122 L.Ed.2d 651 (1993), we refuse to do so, adhering to our decision in *Zachry.* Accordingly, we deny enforcement of that part of the Board's order which directs reinstatement of Creeden with backpay.

### III

Ultrasystems next contends, as part of its argument that the Board's order was inappropriate, that the Board erred in treating this case as one involving a "refusal to consider" applicants for employment rather than one involving a "refusal to hire." It contends that proof for a refusal-to-consider case is different, requiring only a showing that the corporation *"eliminated from consideration* any applications containing indicia of union background," and that the uncontradicted evidence showed that all applications were considered. If the Board had treated the case as a refusal-to-hire case, Ultrasystems argues, the record lacked evidence to enable the Board to order reinstatement of the 66 applicants with backpay.

The company's argument either refuses to take into account the full breadth of the Board's factual findings, which are supported by substantial evidence, or it reflects confusion about the difference between so-called "refusal-to-consider" and "refusal-to-hire" cases. Even if there is a difference in proof between those types of cases, at bottom, the General Counsel of the Board must prove the elements necessary to establish the violations of section 8(a)(3), and derivatively section 8(a)(1), which are charged in the complaint.

Section 7 of the NLRA grants employees the right to organize and form labor unions for the purpose of collective bargaining and other concerted activities. And section 8 identifies as unfair labor practices specific actions which interfere with the rights granted by section 7. On the issue before us, section 8(a)(3) declares that:

(a) It shall be an unfair labor practice for an employer—

(3) by *discrimination in regard to hire* or tenure of employment ... to encourage or discourage membership in any labor organization.

29 U.S.C. § 158(a)(3) (emphasis added). Although section 8(a)(3) is enforced only as to "employees," *see* 29 U.S.C. § 160(c), the Supreme Court has held that the prohibition against "discrimination in regard to hire" also protects *applicants* for employment. *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). While the Court in *Phelps Dodge* firmly recognized the employer's general prerogative in hiring and discharging employees, it observed that to the extent the Act's policy of preserving industrial peace through recognition of labor unions was supported by the prohibition against *dismissing* employees for union activities, so too was it supported by the prohibition against discriminating against union activity *in the hiring process.* *See* 313 U.S. at 182–84, 61 S.Ct. at 846–48. It said,

"Discrimination against union labor in the hiring of men is a dam to self-organization at the source of supply." 313 U.S. at 185, 61 S.Ct. at 848. Thus, while the term "employee," as defined by section 2(3) of the Act, does not explicitly include the term "applicant," the holding of *Phelps Dodge* construes the Act's protection to reach persons who are not employees and who are frustrated in obtaining that employment due to anti-union animus. Construing *Phelps Dodge* in *Zachry*, we observed that in order for an applicant to be afforded the rights of an "employee," the applicant must, *in good faith*, be seeking to become an employee. *See* 886 F.2d at 74.

■ Thus, from the text of the statute and the decisions construing it, it follows that the Board may prove discrimination *in regard to hire* as a violation of section 8(a)(3) of the Act by showing: (1) that the employer is covered by the Act; (2) that the employer at the time of the purportedly illegal conduct was hiring or had concrete plans to hire employees; (3) that anti-union animus contributed to the decision not to consider, interview, or hire an applicant; and (4) that the applicant was a bona fide applicant. *See NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983); *Zachry*, 886 F.2d at 74; and *J.E. Merit Constructors, Inc.*, 302 NLRB 301, 303–04 (1991). The essence of the violation is that the employer discriminated with anti-union animus in regard to its decision whether to hire an employee, for the purpose of discouraging union activity.

The parties have devoted substantial attention in their briefs to whether this is a refusal-to-consider or a refusal-to-hire case, concluding on the basis of language from several Board decisions that for each, the elements of proof differ. *See, e.g., KRI Constructors, Inc.*, 290 NLRB 802 (1988); *Shawnee Industries, Inc.*, 140 NLRB 1451 (1963), *enforcement denied on other grounds*, 333 F.2d 221 (10th Cir.1964); *Apex Ventilating Co.*, 186 NLRB 534 n. 1 (1970). In *KRI Constructors*, the Board implied that a violation of section 8(a)(3) is made out simply by showing the failure of an employer to consider an application for reasons proscribed by the Act, regardless of job availability. It stated:

"[T]he Act is violated when an employer fails to consider an application for employment for reasons proscribed by the Act and the question of job availability is relevant only with respect to the employer's backpay obligation." [Quoting *Shawnee Industries*, 140 NLRB 1451, 1452–53 (1963).] Therefore, "final determination of job availability and possible backpay liability will be properly left to compliance." *Apex Ventilating Co.*, 186 NLRB 354 fn. 1 (1970).

290 NLRB at 812. The selected language may be read to suggest that if the backpay remedy were not sought by the General Counsel, job availability would not be a necessary element of a violation. No case, however, has said that directly, and we question whether merely an employer's discriminatory handling of an application could be the basis for a violation, even when not linked to any employer hiring. The statute speaks unambiguously of discrimination "in regard *to hire*" (emphasis added), and *Phelps Dodge* extends the Act's coverage to applicants for a position of employment, since that is the only way discrimination in regard *to hire* can be neutralized. If an employer is not hiring, and the application is not one that ordinarily would be retained for purposes of future hiring, such as may be the case in the construction industry, it would appear questionable that the simple decision of refusing to consider an application, without more, states a violation. Some nexus is necessary to link the anti-union animus with a hiring decision.

We need not, however, decide all circumstances under which a discriminatory *refusal to consider* an application can be considered "discrimination in regard to hire." In this case, it is uncontroverted that the applications in question were submitted to fill existing openings for employment at both the Rocklin and Bakersfield locations. Thus, any discrimination in refusing to consider them could be found to constitute discrimination in regard to hire.

■ Ultrasystems argues that because the Board treated this case as one involving a discriminatory refusal to consider, the Board

was somehow able to circumvent the company's right to show that even if the anti-union animus was *a contributing factor* in its treatment of the applications, the applicants still would not have been hired because of other legitimate nondiscriminatory reasons. *See Transportation Management*, 462 U.S. at 401–03, 103 S.Ct. at 2474–75; *Wright Line, A Division of Wright Line, Inc.*, 251 NLRB 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). In *Wright Line*, the Board concluded that if anti-union animus was a motivating factor in a mixed-motive case, even though that motivation was combined with other legitimate nondiscriminatory motives, a prima facie case of causation under the Act was established. It permitted the employer to extricate itself from liability in these mixed-motive cases, however, if the employer could prove affirmatively, by a preponderance of the evidence, that without regard to the impermissible motive, the employer nevertheless would have taken the same employment action for legitimate reasons. In the end, with the burdens shared, a violation is established by showing that "but for" the impermissible motive, the adverse employment action would not have been taken.

Approving the allocation of the burden of proving causation, established by *Wright Line* for mixed-motive cases, the Supreme Court in *Transportation Management* concluded that the Board's allocation, while maybe not required by the Act, is a permissible and reasonable interpretation of the Act. *Id.* 462 U.S. at 402–403, 103 S.Ct. at 2474–75. The Court explained:

> The employer is a wrongdoer; he has acted out of a motive that is declared illegitimate by the statute. It is fair that he bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing.

*Id.* at 403, 103 S.Ct. at 2475.

██ We can discern no basis in the record in this case to conclude that this shared burden of proving causation was not applied to the proceedings before the ALJ. Some confusion does exist and is reflected in the briefs about the proper stage of the proceedings for the employer to prove facts such as whether all 66 applicants were qualified for the open positions and how many positions were open. The General Counsel has allowed that these are matters for presentation by the company in a later compliance proceeding. While that may be consistent with the Board's enforcement procedures to tailor orders to the facts, there is a limit to how many issues may be transferred from the principal trial to a compliance proceeding. If the employer could have extricated itself from all liability by showing that *none* of the 66 applicants would have been hired, even without the impermissible motive, it could have done so, and the record indicates it attempted to do so. To this end, Ultrasystems attempted to show that the applications were stale or that some of the applicants were not qualified or not interested. Even with that evidence, there was still contrary evidence from which a rational factfinder could properly have concluded that Ultrasystems' refusal to consider applications or delaying their consideration was due, at least in part, to their union affiliation.

For instance, direct statements of anti-union motive with respect to these applications were attributed to management officials assigned responsibility in hiring for both Rocklin and Bakersfield, and evidence was presented to show that applications from union members were set aside, forwarded to higher management, and delayed. Even though this evidence was disputed and conflicting evidence was offered, the ALJ, who made credibility findings, could rationally have concluded that Ultrasystems maintained a hiring policy by which it "screens job applicants to uncover suspected union sympathizers and by refusing to consider any applicant for employment based on its conclusion that he is likely to be a union sympathizer." Because Ultrasystems was given the opportunity to show that none of the applicants would have been hired even in the absence of such improper motivation, and because the ALJ and the Board reasonably rejected this argument based upon evidence in the record, we believe that the Board acted within its power

in finding a violation here. Accordingly, we sustain that aspect of the Board's order.

## IV

■ Ultrasystems contends that even with the factual findings adverse to it, the Board ordered more relief than was justified by the findings. The company argues that by ordering all 66 applicants to be reinstated with backpay, the Board's order "places the discriminatees in a better position than they would have been in if there had been no discrimination, and this result does not effectuate the purposes and policies of the Act." The General Counsel responds simply that such matters are traditionally left for resolution during a compliance proceeding and that the order in its present form should be enforced.

The ALJ, describing the violations found, stated that Ultrasystems had in place "an unlawful policy designed to screen from employment individuals whom it deem[ed], rightly or wrongly, to be likely to engage in union activity." No findings were made about how many jobs were available and how many would have been filled by union applicants in the absence of discrimination. On the contrary, the ALJ expressly left such determinations open, to be resolved in a compliance proceeding. The ALJ directed simply that Ultrasystems make whole only those applicants who "may have suffered by reason of the discriminatory refusal to consider them for employment." On appeal by the General Counsel, the Board modified this order to direct backpay to *all 66 applicants* and additionally to reinstate them in substantially equivalent positions, if the positions at Rocklin and Bakersfield were no longer available. In these modifications, we believe, the Board went beyond the scope permitted by § 10(c) of the Act.

■ Section 10(c) of the Act empowers the Board to remedy violations of the Act by issuing orders

> requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without

backpay, as will effectuate the policies of [the Act].

29 U.S.C. § 160(c). Orders so entered may be enforced, or modified and enforced, by the courts of appeals. *See* 29 U.S.C. § 160(f). In considering Board orders, the courts of appeals may not substitute their own judgment for that of the Board, which is given broad discretion within the scope of section 10(c) and which has special expertise in the matter. *See Phelps Dodge,* 313 U.S. at 194, 61 S.Ct. at 852. Thus, the Board is given the power to fashion the particular remedy that is consistent with Congress' mandate to the Board to "effectuate the policies" of the Act. *See NLRB v. Seven–Up Bottling Co.,* 344 U.S. 344, 347, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953).

■ While the discretion within the scope of the Act is broad, limitations do apply. In *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 900, 104 S.Ct. 2803, 2813, 81 L.Ed.2d 732 (1984), the Court observed that the constraints of the statutory language require that "a proposed remedy be tailored to the unfair labor practice it is intended to redress." Stated affirmatively, the Board is authorized to make employees only whole, and not more, by "restoring the economic status quo that would have obtained but for the company's wrongful [action]," *NLRB v. J.H. Rutter–Rex Manufacturing Co.,* 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969), and to "neutralize" the discrimination, *see Phelps Dodge,* 313 U.S. at 192–193, 61 S.Ct. at 852. The Court in *Sure–Tan* admonished:

> [I]t remains a cardinal, albeit frequently unarticulated assumption, that a backpay remedy must be sufficiently tailored to expunge only the *actual,* and not merely *speculative,* consequences of the unfair labor practices. [*Phelps Dodge,* 313 U.S.] at 198 [61 S.Ct. at 854] ("[O]nly actual losses should be made good ...").

467 U.S. at 900–01, 104 S.Ct. at 2813.

Under the Board's practice, adopted by regulation and recognized by the Supreme Court, the Board often enters a generalized order, for example, directing reinstatement with backpay, leaving to "compliance proceedings" the determination of the appropriate amount. *See* 29 C.F.R. § 102.52; *Sure–*

*Tan*, 467 U.S. at 902, 104 S.Ct. at 2814. Other factors similarly may be left open for particularization in a compliance proceeding to tailor an order to the circumstances. *See J.H. Rutter–Rex*, 396 U.S. at 260, 90 S.Ct. at 418–19. The more substantial the matters which are left open to "compliance," however, the more the compliance proceedings begin to resemble trials on the merits. The affirmative defense, for example, that the employer was not hiring, which might relate both to liability and to compliance with a remedy, should not be omitted from consideration in the liability phase on the basis that it can just as easily be addressed in a compliance proceeding. It is for the same reason that it would not be consistent with the Act for the Board to enter an order finding only that the employer violated the Act and reserving for later determination, in a compliance proceeding, the nature of the remedy to be imposed. A fracturing of the liability determination from the remedy determination would violate the requirements that we review only final orders. *See* 29 U.S.C. § 160(f). In the same vein, the Board ought not to issue an order so generalized as not to be suited for or tailored to the liability finding, deferring to a later compliance proceeding the gross "tailoring" of the order. The order in the first instance, even though general, must nevertheless be congruent with the scope of discrimination, so that its enforcement neutralizes the discrimination, and does not go beyond.

The ALJ found in this case that the employer unlawfully "screened" applicants when filling open positions. He ordered the practice to cease, and he ordered backpay *for those who would have been hired* but for the improper motive. This order matched the ALJ's findings. The ALJ did not, nor could he, consistent with his findings, order backpay and reinstatement for *all* 66 applicants. Yet this is what the Board ordered when it modified the ALJ's order. If it turns out in compliance proceedings that only 10 vacancies existed, it goes beyond "neutralizing" the "discrimination in regard *to hire*" to order reinstatement of all 66 applicants with backpay. The Board could neutralize the discrimination in screening by ordering *consideration* of the 66 applicants in some prefer-

ential manner on later jobs. And perhaps it also could order reinstatement with backpay *for those found*, in a compliance proceeding, *to have been denied actual positions.* Thus, a refusal to consider begets a remedy that the employer must consider, and when the refusal to consider also results in an actual refusal to hire, the refusal begets the remedy that the employer must hire those applicants who otherwise would have been hired. For these reasons, we refuse to enforce the order as entered by the Board because it requires the employer to reinstate and make whole *all* applicants.

■ Ultrasystems also contends that the Board's order to post notices of violations and employees' labor law rights at other sites is too broad. We disagree. Ultrasystems is a national contractor, and its places of employment are relatively short-lived because at each site employment comes to an end as each construction project is completed. The jobs are typically staffed by "followings" who go with supervisors from site to site. In these circumstances, we believe it was within the scope of the Board's discretion to issue orders to effectuate the policies of the Act to address this fluid employment situs with a national posting requirement. *See J.P. Stevens and Co. v. NLRB*, 623 F.2d 322 (4th Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981).

■ While section 10(f) of the Act authorizes the court of appeals to modify an order and enforce it as modified, when selection of the appropriate remedy is at issue, as it is here, the appropriate course to follow is to remand the case to the Board to fashion the remedy of its own choosing. *See Sure–Tan, Inc.*, 467 U.S. at 905, 104 S.Ct. at 2815.

*PETITION FOR REVIEW GRANTED; PETITION FOR ENFORCEMENT DENIED AND CASE REMANDED FOR FURTHER PROCEEDINGS*