

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-17-2009

# NLRB v. Local 98

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-4764

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"NLRB v. Local 98" (2009). *2009 Decisions*. Paper 1737.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1737

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-4764

———

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL UNION NO. 98,

Respondent.

———

On Application for Enforcement of an Order of the National Labor Relations Board
(Board Case No. 4-CB-9713)

———

Submitted Under Third Circuit LAR 34.1(a)
February 3, 2009

Before: McKEE, STAPLETON, *Circuit Judges*, and IRENAS,* *Senior District Judge*.

(Filed: March 17, 2009)

———

OPINION

———

_____

* Honorable Joseph E. Irenas, Senior United States District Judge for the District of
New Jersey, sitting by designation.

IRENAS, *Senior United States District Judge*.

Before the Court is the application of the National Labor Relations Board

("Board") for enforcement of its order issued against the International Brotherhood of

Electrical Workers, Local Union No. 98 ("the Union"). In a decision and order dated

August 31, 2007, the Board affirmed the determination by an Administrative Law Judge

("ALJ") that the Union violated Section 8(b)(1)(A), 29 U.S.C.A. § 158(b)(1)(A), of the

National Labor Relations Act ("Act").[1] The Board also adopted the ALJ's

recommendation that a broad cease-and-desist order should be imposed upon the Union.

For the reasons that follow, we will grant the application for enforcement.[2]

## I.

### A.

The pertinent factual events in this case occurred on, and adjacent to, the property

of Genesis HealthCare ("Genesis"), a nursing home located on Edison Avenue in

Philadelphia, Pennsylvania. (App. 16 ¶ 5, 19 ¶ 5.) Beginning in January 2006, an entirely

new electrical system was installed in the Genesis facility as part of a significant

---

[1] Throughout this Opinion, references to the subparagraphs of section 8(b) of the Act refer to the corresponding subparagraphs codified under Title 29, Section 158 of the United States Code.

[2] The Court exercises jurisdiction over this application for enforcement pursuant to 29 U.S.C. § 160(e).

2

renovation project .[3]  (App. 57-58.)  Delran Builders Company was the general contractor in charge of the Genesis project, under the leadership of construction superintendent Steve Herman.  (App. 84-85.)  Tri-M Group ("Tri-M"), a non-union employer, was the electrical subcontractor on the Genesis renovation.  (App. 57-58, 127.)  In April 2006, the Union began picketing at the Genesis facility.  (App. 131.)  Raymond Della Vella, employed by the Union as a "business representative organizer," directed the picketing activities.  (App. 44-45, 131.)  The Union initially picketed daily, but later reduced its picketing to Fridays, including Friday, June 16, 2006.  (App. 131.)

The Union typically placed two pickets near each of the two entrances to the Genesis facility.  (App. 132.)  To facilitate understanding of the factual history that follows, it is necessary to describe the contours of the southeastern portion of the Genesis property as it existed on June 16, 2006.

The eastern end of the Genesis parking lot bordered a public sidewalk and Edison Avenue.  (App. 59, 64-65, 191.)  The southern end of the parking lot abutted a wooded area.  (*See* App. 193-98.)  Three large rectangular dumpsters sat at the southernmost end of the parking lot.  (App. 191.)  The long sides of the dumpsters faced the sidewalk and Edison Avenue.  (App. 114, 191.)  The eastern driveway into the parking lot was accessible only via Edison Avenue; that driveway was just north of the three dumpsters. (App. 191.)  Hence, a person standing on the sidewalk dividing Edison Avenue and the

---

[3] The Genesis facility remained open throughout the construction project.  (App. 71.)

eastern driveway, who then walked slightly south, would be standing on the sidewalk between Edison Avenue and the dumpsters.

As noted previously, on June 16, 2006, the Union was picketing the Genesis worksite. (App. 131.) As was its common practice, the Union had notified the Philadelphia Police Department that it would be picketing; two civil affairs officers were observing the demonstration at Genesis. (App. 134.) Union members Craig Cummings and Mike Quinn were picketing in the vicinity of the dumpsters and the eastern driveway. (App. 46-48.)

At approximately 1 p.m. that day, Sean Muth, a Tri-M employee, was driving a backhoe carrying construction debris. (App. 113-14.) Muth intended to deposit the refuse in one of the dumpsters. (Id.) In order to unload the debris properly, it was necessary for Muth to approach the long side of the dumpster. (App. 114.) Hence, Muth entered Edison Avenue, faced the dumpsters, and prepared to proceed. (App. 114-15.) However, Muth could not unload the debris because Cummings and Quinn were picketing in front of the dumpsters, directly in Muth's path. (App. 116-18.)

With his ability to dispose of the debris obstructed, Muth maintained a position six or seven feet away from the picketers. (App. 118.) Joseph Prego, Tri-M's foreman, was working in a different area of the Genesis property when he saw and heard the disturbance near the dumpsters. (App. 60.) Prego informed Steve Herman that a problem was occurring on the worksite and then walked over to determine what was happening.

4

(Id.) Prego directed Muth to drive the backhoe into the parking lot so that traffic on Edison Avenue would not be blocked. (App. 63.) Once the backhoe was in the parking lot, Herman arrived at the incident scene. (App. 87.)

Herman directed Prego and Muth to attempt to dump the debris. (App. 89-90.) However, the pickets continued to block Muth's path. (App. 90-91.) Next, the civil affairs officers spoke to the Union members, but they still refused to yield their positions. (App. 92-93.) After further discussion, Della Vella instructed Cummings and Quinn to move. Muth then deposited the refuse in the dumpster. (App. 94-95.)

The parties disputed two key factual issues concerning the foregoing events during the proceedings before ALJ Paul Buxbaum. First, the parties disagreed about whether Cummings and Quinn were already standing in front of the dumpsters when Muth approached in the backhoe, or if they had moved specifically to obstruct him. Second, the parties contested how much time elapsed between Muth's initial attempt to dispose of the debris and when he finally completed his task.

As to the first factual dispute, Della Vella claimed that Cummings and Quinn were picketing in front of the dumpsters before Muth arrived with the backhoe. (App. 138.) Della Vella perceived Muth's approach as an attempt to interfere with the Union's lawful protest. (Id.) In contrast, Muth testified that Cummings and Quinn moved directly in front of the dumpsters to prevent him from disposing of his cargo. (App. 116.) Neither Cummings nor Quinn testified at the administrative hearing.

5

The ALJ expressly credited Muth's testimony over Della Vella's for three reasons. (App. 8.) First, the ALJ was impressed by the "calm, dispassionate manner" Muth displayed while testifying, leaving the ALJ "with a sense of [Muth's] fundamental neutrality[.]" (Id.) Second, the ALJ found that "logic and common sense" indicated that the pickets would be located near the Genesis driveway, in full view of passerby, rather than in front of the dumpsters at the edge of the wooded area. (Id.) Third, the ALJ drew an adverse inference from the Union's unexplained failure to present testimony from Cummings or Quinn. (App. 8-9.) For those reasons, the ALJ concluded that Cummings and Quinn moved in front of the dumpsters when they saw Muth approaching in the backhoe. (App. 9.)

The second factual dispute concerned the duration of the dumpster incident. Muth testified that thirty to thirty-five minutes passed between his initial approach with the backhoe and his successful deposit of the debris. (App. 122.) Prego estimated that fifteen to twenty minutes passed from when he heard the dispute near the dumpsters to when Muth completed his task. (App. 68.) Herman testified that ten minutes passed from when Prego informed him of the disturbance until his arrival at the incident scene, and another twenty minutes elapsed from his arrival at the incident scene to the end of the dispute. (App. 87, 102.) Della Vella testified that the entire series of events took ten minutes or less. (App. 141.) A report prepared by the civil affairs officers indicated that the picketers yielded five minutes after Herman asked Della Vella to move. (App. 202.)

6

After noting that only Muth and Della Vella were present for the entirety of the events, the ALJ credited Muth's thirty minute time estimate over that of Della Vella. (App. 9.) In crediting Muth's testimony, the ALJ relied on the same three reasons discussed above. The ALJ determined that the police report referring to a five minute time period was describing the duration of "Muth's final attempt to make his dump under police supervision, not to the duration of the entire incident." (App. 10 n.14.)

The ALJ reached a factual conclusion that the pickets observed Muth preparing to deposit debris into the dumpster, intentionally moved into his path, and continued to prevent him from completing his task for approximately thirty minutes. (App. 9.) Applying those facts, the ALJ determined that the Union engaged in an unfair labor practice affecting commerce in violation of Section 8(b)(1)(A) of the Act. (App. 10.)

### B.

Next, the ALJ considered the appropriate remedy for the Union's conduct. Specifically, he considered whether to recommend the imposition of a broad cease-and-desist order against the Union based on a review of its historical conduct–a history which we now summarize.

In 1996, the Union was accused of violating the Act by picketing various employer facilities with the object of compelling those employers to cease doing business with Lucent Technologies. *Int'l Bhd. of Elec. Workers, Local 98 (The Telephone Man, Inc.)*, 327 N.L.R.B. 593, 602 (1999). Those allegations were resolved when the Board entered

an order relying on a stipulated settlement. (App. 177-180.) That order was enforced by this Court. (App. 181; *Nat'l Labor Relations Bd. v. Int'l Bhd. of Elec. Workers, Local 98*, No. 97-3496 (3d Cir. Nov. 25, 1997 (judgment enforcing consent order.)))

In July 1998, ALJ Margaret M. Kern determined that the Union violated the Act in March, 1997, and October, 1997. *The Telephone Man, Inc.*, 327 N.L.R.B. at 601-02. The March, 1997, conduct violated Sections 8(b)(1)(A), 8(b)(4)(i)(B), and 8(b)(4)(ii)(B) of the Act, and included physical assaults upon an employer and employees, destruction of employer property, and coercive action intended to force an employer to cease doing business with a contractor. *Id.* at 601. The October, 1997, conduct violated Sections 8(b)(4)(i)(B) and (ii)(B) of the Act. *Id.* at 601-02. ALJ Kern recommended the imposition of a broad cease-and-desist order on the Union. *Id.* at 602. The Board adopted that recommendation and imposed such an order in February, 1999. *Id.* at 593. This Court enforced the broad order via a default judgment dated September 29, 2000. (App. 182; *Nat'l Labor Relations Bd. v. Int'l Bhd. of Elec. Workers, Local 98*, No. 99-3977 (3d Cir. Sep. 29, 2000 (order granting default judgment in favor of Board on application for enforcement.)))

In June 2000, ALJ George Aleman found that the Union violated the Act on multiple occasions and as to various employers in May, June, and August, 1999. *Int'l Bhd. of Elec. Workers, Local 98 (MCF Servs., Inc.)*, 342 NLRB 740, 762 (2004). In May, the Union contravened Section 8(b)(1)(A) of the Act by blocking employees from

reporting to work. *Id.* at 757-58. In August, the Union violated Section 8(b)(1)(A) by photographing employees and their vehicles entering and leaving a worksite. *Id.* at 753. That same month, the Union committed further violations of Section 8(b)(1)(A) by (1) blocking an employee driving a forklift from depositing refuse into a dumpster and (2) threatening that employee with future harm. *Id.* at 751-53.

ALJ Aleman also determined that the Union violated Sections 8(b)(4)(i)(B) and (ii)(B) on multiple occasions. *See id.* at 762. Most notably, a June, 1999, violation of 8(b)(4)(ii)(B) involved a threat by Della Vella to engage in mass picketing at a UPS location unless UPS terminated its contractual arrangement with a non-union electrical subcontractor. *Id.* at 761. On June 24, the Union carried out the threatened picketing in a manner that violated Section 8(b)(4)(i)(B). *Id.* at 761-62.

ALJ Aleman recommended the imposition of a broad cease-and-desist order upon the Union. *Id.* at 762-63. The Board imposed the recommended broad order, which this Court recently enforced.[4] *NLRB v. Int'l Bhd. of Elec. Workers*, 251 F.App'x 101, 102 (3d Cir. 2007).

In September 2002, the Board issued a decision in a Section 10(k) proceeding stemming from an allegation that the Union violated Section 8(b)(4)(D) of the Act. *NLRB v. Int'l Bhd. of Elec. Workers, Local Union No. 98 (Swartley Bros. Eng'rs, Inc.)*, 337 N.L.R.B. 1270 (2002). In *Swartley Bros.*, a general contractor was overseeing a

---

[4] At the time of the administrative proceedings in this case, the Board's application for enforcement of its order in *MCF Servs.* was still pending before this Court. (App. 13.)

project in Philadelphia. *Id.* at 1270. The general contractor had retained Swartley Brothers Engineers, Inc. ("Swartley"), a nonunion employer, as an electrical subcontractor. *Id.* On January 4, 2002, union-represented crane operators and operating engineers were on the job site; no Swartley employees were present. *Id.* That morning, Della Vella arrived at the site and inquired as to the identities of subcontractors that had been retained by the general contractor. *Id.* Upon learning that Swartley was to perform the electrical work, Della Vella became hostile. *Id.* He spoke to the crane operators and operating engineers; those union workers ceased their work shortly thereafter. *Id.* Then, Della Vella began picketing the location. *Id.* The project did not resume until ten days later, after Swartley had been replaced. *Id.* at 1271. The Board determined that Swartley was rightfully entitled to perform the disputed work and issued a broad order in its favor. *Id.* at 1272-73.

The Board determined that the conduct underlying *Swartley Bros.* violated a prior order of this Court and pursued civil contempt proceedings against the Union and Della Vella. *Id.* at 1273 n.7. Those contempt proceedings were resolved on September 16, 2003, by this Court's consent order implementing the parties' stipulated settlement. (App. 204-10; *Nat'l Labor Relations Bd. v. Int'l Bhd. of Elec. Workers, Local 98*, No. 99-3977 (3d Cir. Sep. 16, 2003 (consent order approving parties' stipulated agreement.))) Among other conditions, that order required Della Vella to remit $5,000 to the Board, a sum representing "a compromised amount of fines, compensatory damages and/or

10

attorneys' fees caused by Della Vella's failure to comply with the picketing and other provisions of the Court's prior orders . . . ." (App. 204.) The Union was specifically barred from reimbursing the $5,000 to Della Vella. (App. 205.)

In evaluating the appropriate remedy in the instant case, the ALJ noted that the most recent prior related misconduct by the Union and Della Vella was the Swartley incident in January, 2002. (App. 14.) According to the ALJ, the passage of four and one-half years between that misconduct and the current case "insulate[d] the Union from a finding of proclivity based solely on a history of prior misconduct." (Id.) Nevertheless, the ALJ explained that a broad order was necessary and appropriate for two reasons. (Id.) First, a Union, like a corporation, acts through its agents. (Id.) Thus, the ALJ thought broad relief was particularly appropriate because the misconduct in the present case occurred under the supervision of Della Vella, a driving force behind prior Union misconduct. (Id.) Second, Della Vella engaged in the current misconduct less than three years after the resolution of his contempt proceedings. (Id.) The ALJ recommended the imposition of a broad cease-and-desist order upon the Union. (App. 14-15.)

In August, 2007, the Board affirmed the ALJ's rulings, findings, and conclusions and also adopted the recommended broad order. (App. 6.) In doing so, the Board expressly declined to rely on the ALJ's conclusion that conduct occurring more than four years prior cannot be considered in deciding whether a party is a recidivist offender of the Act. (App. 6 n.2.) The Board explained that a broad order should issue when the totality

11

of the circumstances so indicates. (Id.)

The Board now seeks enforcement of its order.

## II.

The Union challenges the Board's decision on two fronts–the factual findings and the remedy. As to the underlying factual findings, the Union argues that substantial evidence does not support the Board's determinations. As to the remedy, the Union contends that the Board abused its discretion by imposing a broad cease-and-desist order.

## A.

The Board adopted the ALJ's finding that the Union violated Section 8(b)(1)(A) of the Act by intentionally obstructing Muth's ability to complete a work task for a period of approximately thirty minutes. Our review of the Board's factual findings is limited to considering whether those findings "are supported by substantial evidence on the record as a whole." *Trimm Assocs., Inc. v. NLRB*, 351 F.3d 99, 102 (3d Cir. 2003) (citing *Spectacor Mgmt. Group v. NLRB*, 320 F.3d 385, 390 (3d Cir. 2003); 29 U.S.C. § 160(e)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Allegheny Ludlum Corp. v. NLRB*, 301 F.3d 167, 181 (3d Cir. 2002) (quoting *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001)) (internal quotation marks omitted). If supported by substantial evidence, we are bound to uphold the Board's factual findings as conclusive. *Id.*

Here, the ALJ credited Muth's testimony that the pickets moved in front of the dumpsters to block his path, while discrediting the contrary testimony by Della Vella. The Union now assails that finding as unsupported by the evidence in the record. We disagree and find that the record contains substantial evidence in support of the ALJ's findings.

After observing the testimony of both Muth and Della Vella, the ALJ was favorably impressed by Muth's "calm, dispassionate manner[,]" going so far as to explain that Muth "left [the ALJ] with a sense of his fundamental neutrality in this dispute." The ALJ had no similar praise for Della Vella's demeanor. While the Union disputes that appraisal of Muth's neutrality, the ALJ was the lone factfinder with a firsthand opportunity to observe the testimony and demeanor of Muth and Della Vella. Thus, the ALJ was particularly well-positioned to determine the credibility of those witnesses. *See E. Eng'g & Elevator Co., Inc. v. NLRB*, 637 F.2d 191, 197-98 (3d Cir. 1980). The Union's bare assertion that Muth's testimony was biased in favor of his employer is insufficient to displace the credibility findings of the ALJ.

During the administrative hearing, only Muth and Della Vella offered testimony concerning the pickets' location before Muth approached; Cummings and Quinn were absent from those proceedings. In light of their unexplained absence, the ALJ drew an adverse inference against the Union. As the ALJ recognized, the location of Cummings and Quinn is a key issue in this case. The failure of either man to corroborate Della

13

Vella's version of the events is striking and provides further support for the conclusion that the men moved into Muth's path.

The ALJ also observed that picketing at the entrance, rather than in front of the dumpsters, "comports with logic and common sense." While the Union disputes that assessment, the ALJ made his finding after reviewing exhibits, including photographs and a diagram of the Genesis property. The Union has identified no basis to set aside the ALJ's observation other than its own self-serving assertion that the dumpsters were a higher visibility location.

Finally, the ALJ noted that Della Vella's testimony was inconsistent. At one point during his direct examination, Della Vella agreed that Cummings and Quinn were picketing at the "east entrance." According to the ALJ, this testimony meant that the pickets were standing "at some distance from the dumpster[,]" rather than in front of the dumpster. According to the Union, the "east entrance" refers to an area that includes both the dumpsters and the eastern driveway. We would agree that Della Vella's testimony on this point is somewhat ambiguous. However, the ALJ's conclusions are nevertheless based upon substantial evidence adequate to support the conclusion that Cummings and Quinn moved their positions to prevent Muth from completing his work task.

The Union also challenges the finding that the incident lasted thirty minutes. According to the Union, the ALJ should not have credited Muth's estimate that the events lasted thirty to thirty-five minutes because Muth's approximation diverged from those of

14

Prego, Herman, Della Vella, and the civil affairs officers. We disagree and find that the testimony of Herman and Prego can be easily reconciled with Muth's testimony. As noted above, Muth testified that the entire incident lasted thirty to thirty-five minutes. Herman's testimony was consistent with Muth's; Herman estimated that ten minutes passed from when he learned of the dispute until his arrival at the dumpsters, and twenty more minutes elapsed before Muth completed his task. Prego testified that fifteen to twenty minutes passed from when he learned of the disturbance until Muth dumped the debris, an estimate that did not account for the passage of time before Prego became aware of the incident. Only Della Vella claimed that the incident lasted ten minutes or less. The temporal estimates of Muth, Herman, and Prego provide substantial evidence supporting the ALJ's conclusion that the standoff lasted thirty minutes.[5]

The ALJ's finding that, for a period of thirty minutes, the Union intentionally obstructed Muth's ability to deposit the debris in the dumpsters is supported by substantial evidence.

B.

Pursuant to 29 U.S.C. § 160(c), the Board is entrusted with "the primary

---

[5] We recognize that the civil affairs officers' report references a five minute time interval before Muth was able to dump the debris. Read in context, we find that the reference to five minutes describes the time between when Herman asked the Union members to move and when Muth completed his task. We are not persuaded by the Union's claim that the report was intended to suggest the entire incident took just five minutes, particularly given that Della Vella himself admitted that the incident took closer to ten minutes.

15

responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." *Quick v. NLRB*, 245 F.3d 231, 254 (3d Cir. 2001) (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898-99 (1984)). We are not to "substitute [our] judgment for that of the NLRB in determining how best to undo the effects of unfair labor practices." *Id.* (quoting *Sure-Tan*, 467 U.S. at 899). The Board's chosen remedy "must not be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *Id.* (quoting *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964)).

Under Board precedent, a broad order is appropriate only "when a respondent is shown to have a proclivity to violate the Act or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights." *Hickmott Foods*, *Inc.,* 242 N.L.R.B. 1357, 1357 (1979). The *Hickmott Foods* inquiry looks to "the totality of circumstances to ascertain whether the respondent's specific unlawful conduct manifests an attitude of opposition to the purposes of the Act to protect the rights of employees generally, which would provide an objective basis for enjoining a reasonably anticipated future threat to any of those Section 7 rights." *Five Star Mfg., Inc.*, 348 N.L.R.B. 1301, 1302 (2006) (internal quotation marks omitted).

In this case, the Board adopted the ALJ's recommendation that a broad cease-and-

desist order was warranted in light of past misconduct by the Union and Della Vella. The Union now contends that the Board abused its discretion by imposing that order. According to the Union, a broad order was not warranted because its past misconduct was remote in time and dissimilar in nature.

Turning first to the staleness issue, the Union claims that the Board historically does not consider misconduct which occurred more than four years prior when fashioning a remedy. The Union reasons that it could not have a proclivity to violate the Act when its most recent misconduct occurred in January 2002, more than four years before the conduct underlying this case. In rendering its decision in this case, the Board expressly declined to recognize any such rigid time limitation. Instead, the Board explained that the propriety of a broad order is based on an assessment of the totality of the circumstances including the proximity or remoteness of the dates of prior unfair labor practices and related administrative and judicial orders.

The Union cites no authority requiring the Board to wholly disregard misconduct from more than four years prior when determining the appropriate remedy for unfair labor practices. The series of decisions cited by the Union do not establish or recognize any such unwavering legal principle.[6] Those cases merely illustrate the unremarkable

___

[6] The Union correctly notes that the Board has, in some decisions, regarded misconduct from four or five years prior as too remote to support a finding of proclivity to violate the Act. *See Int'l Union of Operating Eng'rs, Local No. 12 (Hensel Phelps Constr. Co.)*, 284 N.L.R.B. 246, 246 n.2 (1987) (finding two separate instances of misconduct five years prior were too remote to support a finding of proclivity); *Plumbers Local 388 (Daily Heating and Air Conditioning, Inc.),* 280 N.L.R.B. 1260, 1280 (1986)

17

proposition that passage of time between acts of misconduct is relevant to whether the totality of the circumstances warrants the imposition of a broad remedial order. Moreover, this case is unlike those cited by the Union. Here, it was only in September, 2003, that the Union and Della Vella resolved civil contempt proceedings via a stipulated settlement. The instant case involves misconduct that occurred in June 2006, less than three years later.

Next, the Union argues that the Board improperly relied on dissimilar past misconduct in concluding that it had a proclivity to violate the Act. The Union's history of misconduct includes violations of different subsections of Section 8(b) of the Act, whereas this case involves only a violation of subsection 8(b)(1)(A). Thus, the Union argues that the Board should have disregarded all but prior violations of subsection 8(b)(1)(A) when fashioning a remedy in this case.

As support for its argument, the Union principally relies on the Board's recent decision in *Metta Electric*, 349 N.L.R.B. 1088 (2007) (*Metta II*). In the original *Metta Electric* decision, 338 N.L.R.B. 1059 (2003) (*Metta I*), the Board determined that an employer had violated Sections 8(a)(1), (3), and (5) of the Act and imposed a narrow remedial order upon the employer. *Metta I*, 338 N.L.R.B. at 1059, 1065-67. In *Metta II*, the ALJ determined that the employer had again violated Section 8(a)(5) of the Act.

_____

(according minimal significance to a consent judgment from four to five years prior when assessing an appropriate remedy). However, it does not follow from those decisions that the Board is bound to disregard misconduct occurring more than four years prior in all cases.

18

*Metta II*, 349 N.L.R.B. at 1093. The ALJ then summarily concluded that a broad cease-and-desist order was warranted solely because it was the second labor violation by the employer. *Id.* at 1094.

The Board declined to adopt the recommended broad order and rejected the premise that such an order should automatically issue because the employer violated the Act twice. *Id.* at 1088 n.2. As the Board explained, the narrow order in *Metta I* was largely successful, insofar as the employer had not repeated much of its previous improper conduct. *Id.* at 1088. Among other factors, the "narrowing scope of violations" from *Metta I* to *Metta II* led the Board to conclude that a broad order was not warranted. *Id.*

The Union would read *Metta II* for the proposition that a broad order is not warranted when a subsequent violation of the Act involves a different variety of misconduct than any prior violations. In addition, the Union would rely on *Metta II* for the principle that a broad order should not issue when subsequent misconduct is less egregious than prior unfair labor practices. We disagree and decline the Union's invitation to extrapolate such sweeping legal principles from the fact-sensitive *Metta II* decision. In addition, the Union's history of repeated misconduct indicates a far more flagrant disregard for the Act than the employer in the *Metta* cases, which had only run afoul of the Act on two occasions.

Moreover, the ALJ in this case rejected this line of argument by the Union. The

ALJ acknowledged that a finding of proclivity is generally based on "prior adjudications of 'similar unlawful conduct in the past.'" (App. 11 n.16 (quoting *Teamsters Local Union No. 166 (Shank/Balfour Beatty)*, 327 N.L.R.B. 449, 455 (1999.))) However, the ALJ explained that "it is important not to confuse 'similar' with 'identical.'" (App. 11 n.16.) Hence, the ALJ considered "past adjudications for unlawful picketing activities under any portion of Sec. 8(b)." (Id.) Such an approach was appropriate, according to the ALJ, because "[t]o confine examination only to adjudications under the precise subsection of the statute alleged in this case would be to exalt form over substance and to ignore the Board's instruction to consider the totality of the relevant circumstances when fashioning an appropriate remedy." (App. 11 n.16 (citing *Five Star Mfg.*, 348 N.L.R.B. 1301.)) Aside from its ill-founded reliance on the *Metta* cases, the Union has identified no basis to disturb the ALJ's considered explanation, and we will not do so.

We now turn to the question of whether the Board abused its discretion by imposing a broad cease-and-desist order upon the Union. As detailed above, the Union has been repeatedly disciplined for unfair labor practices. As the ALJ recognized, a Union acts through its representatives, and Della Vella was involved in prior Union misconduct. Less than three years prior to the conduct underlying this case, Della Vella was required to personally remit $5,000 to the Board in settlement of civil contempt charges. The Union is correct that Della Vella's conduct resulting in the contempt action occurred more than six years prior to the current incident. However, Della Vella's

misconduct within three years of resolving the contempt action indicates that he remains undeterred in his disregard for the Act. We also note that the Union continued to place Della Vella in charge of picketing activities despite his history of violations of the Act. Given this history and the limited nature of our review, we find that the Board was within its discretion to impose a broad remedial order upon the Union.

## III.

For the reasons set forth above, we find that substantial evidence supports the Board's determination that the Union violated Section 8(b)(1)(A) of the Act. We further find that the Board acted within its discretion when it imposed a broad remedial order upon the Union. The Board's application for enforcement of its order issued against the Union will be granted.